Volume 4

Pages 600 - 716

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE WILLIAM H. ALSUP

| | | |
|---|---|---|
| United States of America, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | NO. CR. 08-730 WHA |
| | ) | |
| Ivan Cerna, Marvin Carcamo, | ) | |
| Angel Noel Guevara, Moris Flores, | ) | |
| Guillermo Herrera, | ) | |
| Jonathan Cruz-Ramirez, | ) | |
| Walter Cruz-Zavala, | ) | |
| Daniel Portillo, Erick Lopez, | ) | |
| Walter Chinchilla-Linar, | ) | |
| Cesar Alvarado, Wilbert Castillo, | ) | |
| Jose Quinteros, Melvin Maldonado, | ) | |
| Manuel Franco, Aristides Carcamo, | ) | |
| Rafael Montoya, Luis Herrera, | ) | |
| Danilo Velasquez, | ) | |
| Giovanni Hernandez, | ) | |
| | ) | San Francisco, California |
| Defendants. | ) | Tuesday |
| | ) | November 2, 2010 |
| _____ | ) | 7:40 a.m. |

**REDACTED TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES:**
**For Plaintiff:**          U. S. Attorney's Office
                            450 Golden Gate Avenue, 11th Floor
                            San Francisco, CA  94102
                            (415) 436-6805
                    **BY:  WAI SHUN WILSON LEUNG
                            WILLIAM FRENTZEN**

(Appearances continued on next page)

**Reported By:     Lydia Zinn, CSR #9223, RPR
                    Official Reporter - U.S. District Court**

```
1   APPEARANCES (CONT'D)

2   For Defendant          Swanson & McNamara, LLP
    Rafael Montoya:        300 Montgomery Street, Suite 1100
3                          San Francisco, CA  94104
                           (4150 477-3800
4                          (415) 477-9010 (fax)
                     BY:   EDWARD W. SWANSON
5
    For Defendant          Law Offices of Richard Mazer
6   Walter                 99 Divisadero Street
    Chinchilla-Linar:      San Francisco, CA  94117
7                          (415) 621-4100
                           (415) 621-4111 (fax)
8                    BY:   RICHARD B. MAZER

9   For Defendant          Law Offices of Frank Bell
    Wilbert Castillo:      333 Bradford Street, Suite 270
10                         Redwood City, CA  94063
                           (650) 365-8300
11                   BY:   FRANK O. BELL

12  For Defendant          Law Offices of Mark S. Goldrosen
    Cesar Alvarado:        255 Kansas Street, Suite 340
13                         San Francisco, CA  94103
                           (415) 565-9600
14                         (415) 565-9601 (fax)
                     BY:   MARK STUART GOLDROSEN
15
    For Defendant          Randy Sue Pollock, Attorney at Law
16  Walter Cruz-Zavala:    2831 Telegraph Avenue
                           Oakland, CA  94609
17                         (510) 763-9967
                           (510) 272-0711 (fax)
18                   BY:   RANDY SUE POLLOCK

19  For Defendant          Sugarman & Cannon
    Ivan Cerna:            44 Montgomery Street, Suite 2080
20                         San Francisco, CA  94104
                           (415) 362-6252
21                         (415) 677-9445 (fax)
                     BY:   CHRISTOPHER J. CANNON
22
    For Defendant          Law Offices of Martin Sabelli
23  Guillermo Herrera:     500 Liberty Street
                           San Francisco, CA  94114
24                         (415) 298-8435
                     BY:   MARTIN ANTONIO SABELLI
25
```

```
 1   APPEARANCES (CONT'D)
     For Defendant          Berman & Glenn
 2   Daniel Portillo:       The Hearst Building, Suite 1100
                            Third and Market Streets
 3                          San Francisco, CA  94103
                            (415) 495-3950
 4                     BY:  JEFFRY MITCHELL GLENN

 5   For Defendant          John Timothy Philipsborn
     Jonathan Cruz-Ramirez: Attorney at Law
 6                          507 Polk Street, Suite 350
                            San Francisco, CA  94102
 7                          (415) 771-3801
                       BY:  JOHN TIMOTHY PHILIPSBORN
 8
     For Defendant          Lupe Martinez, Esq.
 9   Angel Guevara:         1001 West Taylor Street
                            San Jose, CA  95126
10                          (408) 971-4249
                            (408) 286-5705 (fax)
11                     BY:  LUPE MARTINEZ

12   For Defendant          Law Offices of Geri Lynn Green, LC
     Manuel Franco:         155 Montgomery Street, Suite 901
13                          San Francisco, CA  94104
                            (415) 982-2600
14                          (415) 358-4562 (fax)
                       BY:  J. T. SWANSON
15
     For Defendant          Law Office of Mark R. Vermeulen
16   Giovanni Hernandez:    755 Florida Street #4
                            San Francisco, CA  94110-2044
17                          (415) 824-7533
                            (415) 824-4833 (fax)
18                     BY:  MARK RENDON VERMEULEN

19   For Defendant          Michael R. Berger, Attorney at Law
     Jose Quinteros:        1611 Telegraph Avenue, Suite1100
20                          Oakland, CA  94612
                            (510) 834-4511
21                     BY:  MICHAEL R. BERGER

22   For Defendant          Mark Rosenbush
     Moris Flores:          Attorney at Law
23                          214 Duboce Avenue
                            San Francisco, California  94103
24                          (415) 861-3555
                       BY:  MARK ROSENBUSH
25
```

1   **APPEARANCES (CONT'D)**

2   **For Defendant:**              The Nelson Defense Firm
                                    Maybeck Building Four
3                                   1736 Stockton Street
                                    San Francisco, CA  94133
4                                   (415) 388-4606
                                    (415) 388-4612 (fax)
5              BY:   **JASON SHAWN NELSON**

6   **For Defendant**              Law Office of Peter Goodman
    **Erick Lopez;**               400 Montgomery Street, 2nd Floor
7   **specially appearing**        San Francisco, CA  94104
    **for Melvin Maldonado:**      (415) 781-8866
8                                   (415) 781-2266 (fax)
               BY:   **PETER GOODMAN**
9
    **For Defendant**              Law Offices of Shana Keating
10  **Aristides Carcamo**          1934 Divisadero Street
                                    San Francisco, CA  94115
11                                  (415) 567-9422
                                    (415) 776-8047 (fax)
12             BY:   **SHANA KEATING**

13  **For Defendant**              Law Offices of James S. Thomson
    **Luis Herrera:**              819 Delaware Street
14                                  Berkeley, CA  94710
                                    (510) 525-9123
15                                  (510) 525-9124 (fax)
               BY:   **JAMES SCOTT THOMSON**
16
    **For Defendant**              Kourosh Ken Behzadi, Attorney at Law
17  **Marvin Carcamo:**            2467 Via De Los Milagros
                                    Pleasanton, CA  94566
18                                  (310) 441-9341
                                    (310) 441-5563 (fax)
19             BY:   **KOUROSH KEN BEHZADI**

20  **Also Present:  Carol Rhine-Medina, Spanish-language interpreter**

21                   **Jack Medina, Spanish-language interpreter**

22

23

24

25

1          **THE COURT:**  Welcome, everyone.  Be seated, please.

2    Welcome back.  And let's get started with our appearances.

3          **THE CLERK:**  Calling Criminal Number C.R. 08-730.

4    It's United States versus Ivan Cerna, Marvin Carcamo,

5    Angel Guevara, Moris Flores, Guillermo Herrera,

6    Jonathan Cruz-Ramirez, Walter Cruz-Zavala, Daniel Portillo,

7    Erick Lopez, Walter Chinchilla-Linar, Cesar Alvarado,

8    Wilbert Castillo, Jose Quinteros, Melvin Maldonado,

9    Manuel Franco, Aristides Carcamo, Rafael Montoya, Luis Herrera,

10   Danilo Velasquez, and Giovanni Hernandez.

11         Counsel, could you please state your appearances?

12         **MR. FRENTZEN:**  Good morning, your Honor.

13   William Frentzen and Wilson Leung, for the Government.

14         **MR. SABELLI:**  Good morning, your Honor.

15   Martin Sabelli, for Guillermo Herrera, who's present.

16         **MR. GOLDROSEN:**  Good morning, your Honor.

17   Mark Goldrosen, for Cesar Alvarado, who's present.

18         **MS. POLLOCK:**  Good morning, your Honor.

19   Randy Sue Pollock, on behalf of Walter Cruz-Zavala, who's

20   present.

21         **MR. GOODMAN:**  Good morning, your Honor.

22   Peter Goodman, appearing for Erick Lopez, who is present.

23         I'm also appearing specially for Brian Berson, on

24   behalf of Melvin Maldonado.

25         **MR. ROSENBUSH:**  Good morning, your Honor.

1  Mark Rosenbush, for Moris Flores.

2  　　　　　Your Honor, there is a lot of static coming through

3  the speakers here in the jury box.  It's hard to hear.

4  　　　　**MR. BERGER:**  So, your Honor, I'm Michael Berger, for

5  Mr. Quinteros, who is present, and assisted by the services of

6  the interpreter.

7  　　　　**MR. CANNON:**  Good morning, your Honor.

8  Christopher Cannon, for Ivan Cerna.

9  　　　　**MR. PHILIPSBORN:**  Good morning, your Honor.

10 John Philipsborn, for Jonathan Cruz-Ramirez, who's present.

11 　　　　　And, your Honor, with the Court's indulgence, I

12 actually have to leave to make a court appearance in Hawaii.

13 And if it's okay with the Court, at about -- beginning at about

14 ten o'clock, Mr. Goldrosen's going to be standing in for me.

15 　　　　　Thank you.

16 　　　　**MS. KEATING:**  Good morning, your Honor.

17 Shana Keating, on behalf of Aristides Carcamo.  Just so the

18 Court is aware, we're having a speaker issue over here again.

19 　　　　**THE COURT:**  Thank you.

20 　　　　**MS. KEATING:**  All right.

21 　　　　**MR. THOMSON:**  James Thomson, on behalf of

22 Luis Herrera, who is present in court, your Honor.

23 　　　　　Now the noise is back.

24 　　　　**MR. ED SWANSON:**  Good morning, your Honor.

25 Ed Swanson, on behalf of Rafael Montoya.

1           **MR. NELSON:**  Jason Nelson, on behalf of

2    Danilo Velasquez.

3           **MR. MARTINEZ:**  Lupe Martinez, on behalf of

4    Angel Guevara.  He is present.

5           **MR. VERMEULEN:**  Good morning.  Mark Vermeulen, for

6    Giovanni Hernandez.  He's present in custody.

7           **MR. MAZER:**  Richard Mazer, for

8    Walter Chinchilla-Linar, who is personally present.

9           Your Honor, I have an 11:00 o'clock appearance before

10   Judge Illston.  And, with the Court's indulgence and

11   Mr. Chinchilla's permission, perhaps one of the other attorneys

12   could stand in for me.  I am not going to be questioning the

13   witness today.

14          **MR. THOMSON:**  I'll stand in for Mr. Mazer.

15          **THE COURT:**  Thank you, Mr. Thomson.

16          **MR. BELL:**  Frank Bell, for Wilbert Castillo.  He is

17   present, in custody.

18          **MR. GLENN:**  Jeffry Glenn, for Daniel Portillo,

19   your Honor.

20          And 11 and 12, Frank Bell stand-in.

21          **MR. BEHZADI:**  Good morning, your Honor.  Ken Behzadi,

22   on behalf of Marvin Carcamo.

23          **MR. J.T. SWANSON:**  Good morning, your Honor.

24   J. T. Swanson, on behalf of Manuel Franco.

25          **THE COURT:**  Okay.  Dawn, we have to get the noise

1  fixed.

2          **THE CLERK:**  Judge, I have no idea why it won't go

3  off.  I cannot seem to adjust anything on here that's making it

4  stay off.  It was on when we started this morning before I got

5  here.  I have no idea why it's still running.

6          **THE COURT:**  All right.  Now let's hear from the

7  interpreters.  Identify yourselves.

8          **INTERPRETER:**  Jack Medina.  Good morning, your Honor.

9          **INTERPRETER:**  Carol Rhine-Medina, certified Spanish

10  interpreter.  Good morning.

11          **THE COURT:**  Is it still going over there?

12          **MR. ROSENBUSH:**  It's an intermittent problem,

13  your Honor.  It just went off for two or three seconds, and now

14  it's on again.

15          **MR. SABELLI:**  As some of us have observed,

16  your Honor, nothing is easy in this case.

17          **THE CLERK:**  Okay.  Nobody in the Automation

18  Department has arrived that deals with the sound system, but

19  right now nobody's there that can troubleshoot it.  And, from

20  what I can tell, what I would normally do is not working.  So

21  I'm not sure why it's doing that.

22          **THE COURT:**  Can you turn the sound system completely

23  off?

24          **THE CLERK:**  Turn it off, and let's see if we can --

25          **THE REPORTER:**  That will make your realtime stop.

 1          **THE COURT:**  All right.  Can you hear me?

 2          We are doing this the old-fashioned way, without the

 3  benefit of any amplification.  It may or may not work.  So

 4  everyone's going to have to keep their voice up.  Let's give it

 5  a try.  If it doesn't work and someone cannot hear, then we'll

 6  have to wait until the system can be fixed.

 7          Now, are there any defendants who are hearing this in

 8  English, or are they all using an interpreter?

 9          **MR. SABELLI:**  Your Honor, there are some defendants

10  who are listening to either, yes.

11          **THE COURT:**  Those of you who are listening without

12  the benefit of an interpreter -- just listening to the

13  English -- raise your hand if you can understand what I'm

14  saying.

15          All right.  Well, if any of you at some point cannot

16  hear and you want to hear the realtime English version, raise

17  your hand, and we'll try to fix it.

18          How about the lawyers?  Can you hear me okay over

19  there?

20          All right.  All right.  Does Mr. Manuel Franco have

21  an attorney present?  Your name again?

22          **MR. J.T. SWANSON:**  J. T. Swanson.

23          **THE COURT:**  He did announce himself, though.

24          **THE CLERK:**  I'm sorry.  I was doing the sound system.

25  If he did, I just didn't hear it.  I'm sorry.

1            THE COURT:  All right.  Counsel should remind me

2    where we are.  I know we have Officer McDonnell on the stand,

3    but how far are we into the examination?

4            MR. SABELLI:  Your Honor, at the last calling of the

5    case, the Government had finished its direct.  Mr. Philipsborn

6    had done cross-examination of Mr. McDonnell; Mr. Goldrosen had;

7    and I had just started mine.

8            THE COURT:  All right.  I received some emergency

9    from you.

10           MR. SABELLI:  You did, your Honor.  Last night I

11   filed a motion.  I'm not sure whether or not my co-counsel has

12   seen it or not.  I know Mr. Philipsborn has.  And it relates to

13   factual --

14           THE COURT:  Why don't you come up here to the

15   lectern --

16           MR. SABELLI:  Yes, sir.

17           THE COURT:  -- and explain your emergency motion?

18           MR. SABELLI:  Your Honor, last week I learned,

19   through the filing of a public complaint, that there may be a

20   great deal of evidence related to this hearing that has not

21   been given to the defense.

22           And the purpose of this motion is to alert the Court

23   to the fact that we have not been -- we have not been

24   discovered evidence with respect to bases of opinions by

25   Mr. McDonnell, possibly -- certainly by Mr. Molina; possibly or

1   almost certainly by Mr. Flores as well -- that relate to

2   conversations or information given by one of the co-defendants

3   in this case.  It appears not to have been one or two minor

4   contacts, but a long history of debriefings and of significant

5   intelligence given to these experts by a particular person who

6   sits in this courtroom today.  And we have not been given that

7   information.

8           It goes directly to the bases of these expert

9   opinions.  And it goes directly to the issue of whether or not

10  these experts -- and I'm speaking now of Mr. Molina and

11  Mr. McDonnell -- can act properly and constitutionally as

12  actual dual-purpose experts.

13          **THE COURT:**  I think -- let me try to cut this off for

14  a second.

15          I think that this motion -- that you should lay

16  whatever foundation you want with this witness, and that

17  relates to the -- I did read your motion.  I'm not going to

18  move on that now, but I think this is something I should rule

19  on after; after you lay whatever foundation you want.  And, if

20  need be, we will reopen the testimony of the witness to receive

21  further evidence, but in the meantime, I think we ought to

22  proceed, you know, with you asking whatever questions you were

23  going to ask anyway, and lay whatever foundation you want that

24  would be in aid of your pending motion.  And then, if I

25  eventually grant that motion, then we'll bring back the witness

 1  for further examination, but I don't -- I am reluctant to

 2  derail today's hearing, you know, on --

 3          Mr. Leung, what do you have to say?

 4          **MR. LEUNG:**  Your Honor, we would respectfully oppose

 5  allowing this proceeding to be hijacked for the purposes of

 6  free discovery on Mr. Sabelli's motion that is entirely based

 7  on a specious civil complaint.  The complaint itself was just

 8  filed.  The complaint itself is --

 9          **THE COURT:**  Well, why can't he ask the witness

10  questions to find out if it's specious?

11          **MR. LEUNG:**  Well, your Honor, that --

12          **THE COURT:**  If this witness is basing his expert

13  opinions upon the kind of information that is being alleged,

14  Counsel has a right to know that.  That's not specious.

15          **MR. LEUNG:**  The only basis for Counsel's questioning

16  would be allegations filed in a complaint --

17          **THE COURT:**  Yes.

18          **MR. LEUNG:**  -- that Mr. Sabelli believes --

19          **THE COURT:**  What's wrong with that?

20          **MR. LEUNG:**  -- believes are fact, your Honor.  And --

21          **THE COURT:**  He can find out.  Just find out if it's

22  fact, or not.

23          **MR. LEUNG:**  We would just note our objection.

24          We should also note that the underlying civil case

25  really should be dismissed if it seeks declaratory relief or

```
 1   stayed if it seeks damages under Younger versus Harris, which
 2   is a Supreme Court case from 1971.
 3            THE COURT:   That's not my case.   It's for whoever has
 4   the case.
 5            MR. LEUNG:   The issue of the stay or dismissal would
 6   have to be litigated through both courts, your Honor.
 7            THE COURT:   The allegations were made by a lawyer who
 8   practices in California, and is subject to Rule 11 on the civil
 9   side.
10            Whether it's specious or not -- that's your opinion.
11   Counsel can ask questions to lay the foundation to find out if
12   it is specious or not.   Now I'm going to let him do that.
13            MR. SABELLI:   I understand, your Honor.   And with
14   respect to Mr. Molina, Mr. Molina's scheduled to testify on
15   Friday.   We have between now and Friday for the Government to
16   discover evidence with respect to Mr. Molina if it's in the
17   Government's possession; and I think it very clearly is.   I
18   understand --
19            THE COURT:   Well, you can do the same thing there.
20   You can ask Molina those same type of questions to find out if
21   there's evidence there that he's basing his opinions on.
22            MR. SABELLI:   I understand the Court's ruling.
23            MR. PHILIPSBORN:   Your Honor, for the record,
24   John Philipsborn, for Mr. Cruz-Ramirez.
25            We actually formally joined the motion yesterday.   I
```

1   imagine most defense counsel are joining as well.

2           **THE COURT:**  I don't know if they are or not.  I know

3   that you did.

4           **MR. CANNON:**  Your Honor, Christopher Cannon, on

5   behalf of Ivan Cerna.  I just got off of a plain, and I'm

6   looking to see it.  And I assume I will be joining this motion.

7           **THE COURT:**  Well, you can all -- you don't have to

8   stand up and join now.  Just file your written joinders

9   sometime today.  All right?  Can we get started?

10          **MR. FRENTZEN:**  Just briefly, your Honor, to note for

11  the Court that I -- I'm aware, due to e-mail traffic, that

12  counsel knew about this complaint some days ago, yet chose,

13  like, last night, at the final hour, during the Giants game, to

14  file their motion.

15          **MR. SABELLI:**  Well, your Honor, this is probably

16  going to feed the Court's already healthy skepticism about

17  defense counsel.  I'm not a baseball fan, and I had other

18  things to do over the weekend.  I found out about this --

19          **THE COURT:**  I'm sorry to hear you're not a baseball

20  fan.

21          **MR. SABELLI:**  Your Honor, I'm proud of my --

22          **THE COURT:**  What's wrong with you, Mr. Sabelli?

23          **MR. SABELLI:**  I'm proud of my three knee

24  reconstructions.  I'm proud of my three knee reconstructions;

25  30 years on the soccer field.  That's enough for me,

 1   your Honor.

 2          To answer Mr. Frentzen, your Honor, we found out

 3   about it last week.  The Government has known about it for

 4   years.  And I filed this motion as soon as I could.  And I

 5   think that that -- that we're doing our job as best we can

 6   without information that's clearly in the possession of the

 7   Government, your Honor.

 8          **THE COURT:**  All right.  Now I've forgotten.  Is it

 9   your turn to ask questions, or is it the Government's turn?

10          **MR. SABELLI:**  It is my turn, your Honor.

11          **THE COURT:**  Then you may proceed.  Keep your voice

12   up, as you probably will anyway.  I say the same thing to the

13   witness, because everyone -- we don't have a sound system.  So

14   we've got to keep our voices up.

15          Go ahead, Mr. Sabelli.

16                         <u>**DION MCDONNELL,**</u>

17   called as a witness for the Plaintiff herein, having been

18   previously sworn, resumed the stand and testified further as

19   follows:

20                      <u>**CROSS EXAMINATION**</u>

21   **BY MR. SABELLI**

22   **Q.**   Good morning, Mr. McDonnell.

23   **A.**   Good morning.

24   **Q.**   You just heard the exchange we had with the Court about --

25   about Mr. Manuel Franco.  Did you know that we were referring

 1   to Mr. Franco?

 2   **A.**   No.

 3   **Q.**   Okay.  Now, have you heard the name "Manuel Franco"

 4   before?

 5   **A.**   Yes.

 6   **Q.**   Have you met Mr. Franco?

 7   **A.**   I believe so.

 8   **Q.**   Have you met with him when he was giving information to

 9   you as a police officer?

10   **A.**   Does Manuel Franco also use the last name "Hernandez"?

11   **Q.**   Yes.  Manuel Franco Hernandez, also known as "Dreamer."

12   D-r-e-a-m-e-r.

13          Do you know who I'm talking about?

14   **A.**   I do, yes.

15   **Q.**   As a police officer -- as Gang Task Force officer, have

16   you personally met with Manuel Franco?

17   **A.**   Yes.

18   **Q.**   In the context of Mr. Franco acting as an informant?

19   **A.**   Not myself.

20   **Q.**   When you say not yourself, you mean that other Gang Task

21   Force officers have met with Mr. Franco as an informant?

22              **MR. FRENTZEN:**  Objection.  Foundation.

23              **MR. SABELLI:**  If he knows, your Honor.

24              **THE COURT:**  Well, if you know of your own personal

25   knowledge, you can answer.

1          **THE WITNESS:**  I don't know what his capacity was.

2    **BY MR. SABELLI**

3    **Q.**   Okay.  Do you know of other Gang Task Force officers

4    meeting with Mr. Franco?

5          **MR. FRENTZEN:**  Objection.  Foundation.

6          **MR. SABELLI:**  Your Honor, this man's an expert.  He's

7    testified he talks to Mr. Molina and other experts about who

8    they meet and what they learn.

9          **THE COURT:**  That's true.  Experts can rely upon

10   hearsay.  And the witness has said that he's done exactly that.

11   So the counsel is entitled to find out if the information that

12   the witness is relying upon -- he also has information that the

13   source was this person in question.  So that's a proper --

14         The witness can't have it both ways.  If he is an

15   expert and can rely upon hearsay, then we're entitled to find

16   out what the hearsay was.  So the objection is overruled.

17   **BY MR. SABELLI**

18   **Q.**   Now, are you aware of whether or not other Gang Task Force

19   officers have met with Mr. Franco?

20   **A.**   I don't know for sure.

21   **Q.**   You don't know for sure.  Is that your answer?

22   **A.**   Correct.

23         **THE COURT:**  Well, you've got to give -- no.  You're

24   here as an expert.  And you've said that you have relied upon

25   information.  Well, you don't know whether that information is

1  true for sure, either.  It's just information from some other

2  police officer; but since you have relied upon that, Counsel is

3  entitled to get the same degree of information with respect to

4  the question he's pursuing.  So if you have any information --

5  hearsay or otherwise; even third-degree, fourth-degree

6  hearsay -- you must answer the question.  So please try again.

7         Ask the question again, and the witness will answer.

8  **BY MR. SABELLI**

9  **Q.**   Are you aware of any other Gang Task officers who have met

10 with Mr. Franco?

11 **A.**   I don't know.  I know that Sergeant Molina talked about

12 meeting with him.  I don't recall seeing him meeting with him.

13 **Q.**   So a minute ago when you said you didn't know for sure,

14 you knew that Mr. Molina had talked with you about meeting with

15 Mr. Franco?

16 **A.**   Correct.

17 **Q.**   But you answered you didn't know for sure?

18 **A.**   Because I didn't see it.  Correct.

19 **Q.**   Okay, but you know that Mr. Molina told you that he had

20 met with Mr. Franco?

21 **A.**   Correct.

22 **Q.**   And do you know that Mr. Molina told you that he had met

23 with Mr. Franco, and that Mr. Franco had given him information?

24 **A.**   I don't recall that.

25       I also know that Homicide met with Mr. Franco.  Homicide

1    inspectors spoke to him at length.

2    **Q.**    Homicide inspectors in connection with what case?

3    **A.**    I don't know in connection to what case, but I believe it

4    was shortly after the search warrant was served.

5                **MR. FRENTZEN:**  Objection.  Relevance.

6                **MR. SABELLI:**  Your Honor, the witness is in the

7    middle of an answer.

8                **THE COURT:**  Let's hear.

9                **MR. FRENTZEN:**  I'm objecting anyway.  Relevance.

10               **THE COURT:**  All right.

11               **MR. SABELLI:**  Your Honor, I'm exploring the bases of

12   this witness' knowledge of what Mr. --

13               **THE COURT:**  Look.  I want to say to the Government:

14   The Government is the one who has created this problem of

15   having an officer who has investigated MS-13 and other gangs to

16   come in and testify to opinions based on hearsay.

17               You can't have it both ways.  If that's what you

18   want, then defense counsel can find out all about the bases for

19   his opinions, including the hearsay part.  And it --

20               **MR. FRENTZEN:**  Absolutely, your Honor.  My

21   objection -- and I'm sorry if it wasn't framed properly, but my

22   objection is:  Then going off on a rabbit trail about other

23   potential --

24               In other words, we have no idea at this point -- I

25   have no idea at this point as I'm standing here whether this is

```
 1  a homicide which relates to the instant case or not.  If it

 2  does, then perhaps my objection would be withdrawn, because it

 3  may, in fact, relate to the basis of his opinion.

 4          If it is -- excuse me.  I'm sorry, your Honor, but if

 5  it is some separate homicide which is currently being

 6  investigated, and has not resulted in charges, then this is

 7  irrelevant to the -- to the witness' opinions as expressed in

 8  this case, and the basis for those.

 9          In other words, this shouldn't be a wide-ranging

10  investigation in terms of other potentially ongoing

11  investigations.

12          I don't know as I sit here right now what the answer

13  to that is.  And that's why I'm trying to cut it short.

14          THE COURT:  All right.  Well, let me ask the witness.

15          Is this a current investigation that has nothing to

16  do with MS-13 that you're referring to?

17          THE WITNESS:  No.  The homicide is related to MS-13;

18  but I'm not sure what homicide case it was that they're

19  referring to.

20          THE COURT:  How long ago was the homicide?

21          THE WITNESS:  2007/2008, I believe.

22          THE COURT:  All right.  The objection's overruled.

23  BY MR. SABELLI

24  Q.   All right.  Now, you told me that -- just to back up,

25  because I may have gotten a little lost here, Mr. Molina has
```

1  told you that he met with Mr. Franco.  Is that right?

2  **A.**    Correct.

3  **Q.**    And a Homicide inspector has told you that he met with

4  Mr. Franco?

5  **A.**    I don't know if they told me directly, but I new that they

6  did.

7  **Q.**    Okay.  To your knowledge, has anybody else in the Gang

8  Task Force or the San Francisco Police Department generally met

9  with Mr. Franco?

10 **A.**    I don't know.

11 **Q.**    Okay.  And you, yourself, have not been involved in any

12 debriefings with Mr. Franco?

13 **A.**    No.

14 **Q.**    Have you seen any written memoranda, reports, anything

15 that is based upon information given by Mr. Franco?

16 **A.**    Not that I recall.  No.

17 **Q.**    It's your testimony that you have not seen any written

18 statements, memoranda, reports, anything at all that purports

19 to communicate information from Mr. Franco about MS-13?  Is

20 that your testimony?

21 **A.**    Yeah.  What I recall, no, I haven't.

22 **Q.**    Have you had discussions with Mario Molina about what

23 Mr. Franco has told him about MS-13?

24 **A.**    I don't know.  I had brief conversation with him.  Nothing

25 in depth with him.

1  Q.   So you're an MS expert, right?

2  A.   Correct.

3  Q.   Mario Molina's an MS expert?

4  A.   Correct.

5  Q.   You guys were partners?

6  A.   We worked in the same office.

7  Q.   You worked in the Gang Task Force together?

8  A.   Correct.

9  Q.   Manuel Franco is an informer or was an informer within

10 MS-13?

11 A.   Is that what you're saying?

12 Q.   Yeah.

13 A.   Okay.

14 Q.   You know that to be true?

15 A.   I don't know that to be true.

16 Q.   You don't know that to be true?

17 A.   I don't know if he was signed up.  I don't know what his

18 capacity was.  I know that Sergeant Molina spoke to him.

19 Q.   Right.  Whether or not he was signed up or not, he was an

20 individual inside of MS-13 who was giving information to the

21 San Francisco Police Department about MS-13?

22 A.   He was.

23 Q.   I'm asking you.  Do you know that?

24 A.   I'm asking you.  I'm not sure.

25 Q.   Your testimony is you, as a gang expert in the City of San

1    Francisco --

2              THE COURT:  Wait.  Please don't say that again,

3    Officer; that you don't know it for sure.

4              You have been held out here as an expert.  You're not

5    testifying as a percipient fact expert.  You're testifying as

6    an expert who is purporting to rely upon hearsay statements

7    from other officers.  Now, that's the way the Government has

8    presented you.

9              Defense counsel then is entitled to find out if you

10   have any hearsay information -- not just direct personal

11   knowledge; hearsay information -- that corresponds to what

12   Counsel is asking you about.

13             If the Government doesn't want us to go down this

14   track, then we shouldn't have him tendered as an expert, but

15   you have tendered him as an expert.  And it's only fair to let

16   Counsel ask these questions.

17             MR. LEUNG:  There's no objection to that question,

18   your Honor.

19             THE COURT:  Yes, but the witness said he didn't know

20   it for sure.  Now, that's a code word for:  I don't have

21   Biblical knowledge.  I understand that.  That's improper.

22             So ask the question again.

23   BY MR. SABELLI

24   Q.   Are you aware of whether or not Manuel Franco was giving

25   information to Mario Molina or others in the San Francisco

1  Police Department about MS-13 in San Francisco?

2  **A.**   My understanding -- he did.

3  **Q.**   Okay.  And that information or some of that information

4  was communicated to you?

5  **A.**   Yes.

6  **Q.**   And that's because you and Mario Molina and other Gang

7  Task Force officers share information?

8  **A.**   That's correct.

9  **Q.**   If you deem something to be valuable information about

10  MS-13 in San Francisco, you would share it with your other Gang

11  Task Force colleagues?

12  **A.**   Correct.

13  **Q.**   And the way you work is you assume that other Gang Task

14  Force officers would share that kind of information with you?

15  **A.**   Correct.

16  **Q.**   And in that vein -- in that culture within the Gang Task

17  Force, you received information from Manuel Franco indirectly

18  through Mario Molina?

19           **MR. FRENTZEN:**  Objection to that question,

20  your Honor.

21           **THE COURT:**  What's the objection?

22           **MR. FRENTZEN:**  It's -- it's vague.

23           **THE COURT:**  If the witness thinks it's vague, he

24  could say so.

25           Do you understand the question?

 1              MR. FRENTZEN:  My -- I'm sorry.  It's also

 2   foundational, your Honor.  I mean, the question is whether or

 3   not this witness knows that he received information from

 4   Franco.

 5              THE COURT:  If he believes if he did, even though he

 6   doesn't have Biblical knowledge --

 7              MR. FRENTZEN:  That's fine.

 8              THE COURT:  -- if his opinions have been informed by

 9   this investigation.

10              He's already told us that.  So if he believes that

11   the source of the information was Franco, then he should answer

12   the question.

13              What do you think?  Go ahead, Officer.  Tell us the

14   answer.

15              THE WITNESS:  I'm sorry.  Can you ask the question

16   again?

17              MR. SABELLI:  Sure.

18   Q.   Mario Molina, at some point or more than one point, has

19   communicated to you information that he says he received from

20   Manuel Franco?

21   A.   Correct.

22   Q.   And you didn't reject that information, out of hand?

23   A.   No.

24   Q.   If Mario Molina gave it to you, you accepted it, as you

25   would accept other information from him?

1   **A.**   Correct.

2   **Q.**   And that information forms of bases or one of the bases of

3   your opinions, as articulated in these hearings?

4   **A.**   Correct.

5   **Q.**   Do you know whether or not there are any memoranda,

6   reports, or any other kind of statements that have been written

7   about the information that Manuel Franco gave to the

8   San Francisco Police Department?

9   **A.**   I don't know.  In the Gang Task Force, I don't believe

10  there is.  I've searched for everything.

11      In Homicide, related to their case, I couldn't tell you.

12  **Q.**   What about in the Bureau of Investigations?

13  **A.**   What's that?  Are you talking 850 Bryant?

14  **Q.**   Yes.

15  **A.**   Not that I'm aware of.

16  **Q.**   Would there be informant memos about someone like

17  Manuel Franco or about any informants in the Bureau of

18  Investigations?

19  **A.**   If there's an informant that signed up, there's records

20  that are kept regarding an informant.

21  **Q.**   So there are records kept about what you are calling

22  "signed-up informants."  Is that right?

23  **A.**   Correct.

24  **Q.**   And those include memos about those informants?

25  **A.**   I don't know what would be in there.  A memo could be in

 1  there.

 2  **Q.**    Okay.  And those memos might include memos about

 3  Manuel Franco, if he was signed up?

 4  **A.**    Correct.

 5  **Q.**    And those are not kept in the Gang Task Force?

 6  **A.**    No.

 7  **Q.**    Those are kept in the Bureau of Investigations?

 8  **A.**    Yeah.  The Bureau of Investigations.  The captain of

 9  investigations.

10  **Q.**    Captain of investigation?

11  **A.**    But there are also other locations that CI files would be

12  kept, and that would be Narcotics.

13  **Q.**    When you say "CI files," you mean confidential-informant

14  files?

15  **A.**    Correct.  Either confidential informant, or confidential

16  reliable informants.

17  **Q.**    So the CI or the CRI files could be with the captain of

18  investigations, or they could be in the Narcotics Division?

19  **A.**    Correct.

20  **Q.**    And, by the way, when you provided document to the

21  Government in this case -- to the United States to provide to

22  defense counsel -- you didn't search for CRI or CI memos either

23  with the captain of investigations, or with the Bureau of

24  Narcotics.  Is that true?

25  **A.**    That's true.  I don't recall doing that.

1  **Q.**    You did not do that?

2  **A.**    I don't recall doing that, no.

3  **Q.**    Did anyone ever direct you to do that?

4  **A.**    No.

5  **Q.**    Now, you testified last time you were here that your

6  sources of information include police reports, Field Interview

7  cards, and memoranda?

8  **A.**    Correct.

9  **Q.**    Okay.  What memoranda were you referring to?

10  **A.**    Anyone's that I would locate.  So any memos that were

11  written regarding subjects.  Some were in some of the alpha

12  files that were discovered.  Some were in the packet that I

13  discovered that we had for the MS folders; that large folder

14  that was copied and distributed.  I have those memos.

15  **Q.**    Did those include CI memoranda or CRI memoranda?

16  **A.**    I don't know.  I don't know if the memos responded or

17  actually referred to CI in the contacts.  I don't know; but

18  whatever ones we had in the office, I discovered.

19  **Q.**    When you say "the office," you mean the Gang Task Force

20  office?

21  **A.**    Correct.

22  **Q.**    You're not referring to the SFPD generally.  You're

23  referring to GTF only?

24  **A.**    Correct.

25  **Q.**    So when you are testifying and you say, "Hey, it was in

1    the office" -- we can assume you're referring to the Gang Task

2    Force only?

3    **A.**    Correct.  And also the --

4    **Q.**    Okay.

5    **A.**    -- captain's office with regards to memos, because we also

6    queried there as well, writing memos that were --

7           (Reporter interruption)

8                **THE WITNESS:**  Written.  Memos that were written.

9    Queried.  The captain of investigations.

10   **BY MR. SABELLI**

11   **Q.**    Correct.  Captain of investigations.

12   **A.**    The way it works is you'll write a memo in the office.

13   And the Gang Task Force goes up the chain to the captain.  And

14   then that copy stays there.

15   **Q.**    So, for example, 2008, if somebody wrote a memo about

16   Manuel Franco if he were a signed-up informant, or about 1211

17   or about 1218, it would have gone to Ernest Ferrando, who was

18   your lieutenant in the Gang Task Force?

19   **A.**    At the time, correct.

20   **Q.**    And then Mr. Ferrando would have sent it to the captain of

21   investigations?

22   **A.**    Yes.  If there's a CI or a CRI that's being signed up,

23   there's actually a packet for them put together, with

24   standardized forms that are inside.  And then if there's a memo

25   that goes in additionally to that, it would be on a

 1 | case-by-case -- so whether there is a memo with them, it's not

 2 | typically with them.  It's the standardized forms that you fill

 3 | out.

 4 | **Q.**   Were you aware of a packet being created for a

 5 | Manuel Franco?

 6 | **A.**   No.

 7 | **Q.**   How about for a man named **(Name Redacted)**?

 8 |          **MR. FRENTZEN:**  Objection.

 9 |          **MR. LEUNG:**  Objection.

10 |          **MR. SABELLI:**  What?

11 |          **THE COURT:**  What is the objection?

12 |          **MR. FRENTZEN:**  Relevance.

13 |          **THE COURT:**  Is this something we can discuss in open

14 | court, without problems being created, Mr. Sabelli?

15 |          **MR. SABELLI:**  Your Honor, I don't see why we can't

16 | discuss this.  As far as I know, there are no protected

17 | witnesses.  There has been no objection to the use of this

18 | name.

19 |          **MR. FRENTZEN:**  Objection.  I think we do need to take

20 | this up.

21 |          **MR. SABELLI:**  I'm happy to use the term "S.F. 1211,"

22 | if that is a comfort to the Government.

23 |          **MR. FRENTZEN:**  That's fine, then, your Honor.

24 |          **THE COURT:**  All right.  Proceed in that manner.

25 |          **THE WITNESS:**  No.

 1  **BY MR. SABELLI**

 2  **Q.**   Are you aware of S.F. 1211?

 3  **A.**   Yes.

 4  **Q.**   Do you know who that individual is, by his name?

 5  **A.**   I do not.

 6          **MR. FRENTZEN:**  Objection -- for this purpose.

 7          **MR. SABELLI:**  Without using his name.

 8          Because I want to make sure we're talking about the

 9  same person.

10          **THE COURT:**  Well, don't use the name, but do you

11  know --

12          **MR. SABELLI:**  Yeah.

13          **THE COURT:**  Do you know what the name is of 1211 --

14  the real name?

15          **THE WITNESS:**  I -- I believe I do now, with the

16  sequence of events that just occurred.

17  **BY MR. SABELLI**

18  **Q.**   Do you know that person's moniker?

19  **A.**   No.  Um.  Yes.

20  **Q.**   Oh, by the way, you said you do now, because of the

21  sequence of events.  Are you telling us you didn't know his

22  real name five minutes ago?

23          **MR. FRENTZEN:**  Objection, your Honor.  This whole

24  line of inquiry.  I don't know.  Mr. Sabelli's trying to dig a

25  deeper ditch.  I --

1          **MR. SABELLI:**  What is the objection?

2          **THE COURT:**  Just a second.  Here's the problem that I

3    see.  When someone puts an expert on at trial and says what the

4    bases of their opinions are -- which, in this case, with this

5    witness, it was his investigation of MS-13 -- every single fact

6    that this witness knows or has information on that relates to

7    MS-13 is now an open book.

8          And you created this problem, Mr. Frentzen, by

9    designating what ought to be an investigating officer as an

10   expert.

11         So where -- what is the answer?  Did you really think

12   you could keep all of this, now, a secret?

13         **MR. FRENTZEN:**  Your Honor, the inquiry with respect

14   to specific names for the purpose of this proceeding, where we

15   are not at trial, is inappropriate.

16         **THE COURT:**  No.  This is to find out if he's got a

17   basis for his opinions.

18         **MR. FRENTZEN:**  But how is that relevant?  My

19   objection was relevance, your Honor, for the purpose of this

20   proceeding.  And -- and -- and to --

21         **THE COURT:**  What if it turns out that the information

22   that has been given by whatever these sources are is directly

23   contrary to what he is purported to testify to on direct

24   examination?  What if that turned out to be true?

25         **MR. FRENTZEN:**  How does this specific name relate to

1    that issue, your Honor; and especially with Mr. Sabelli just

2    doubling back on a question that he had already agreed he

3    wasn't going to go into?

4         MR. SABELLI:  I did not double back, your Honor.

5         THE COURT:  He didn't double back; the witness did,

6    but the witness purported to say that he didn't even know the

7    real name of this person.  Well, if that's true, what kind of

8    expert is he, if he didn't know the real name of the person?

9         MR. FRENTZEN:  Your Honor, it's called "informants."

10   It's called "a whole different world."

11        And if the Court -- if that's the inquiry, that

12   inquiry can be made without asking the specific name.

13        THE COURT:  Yes.  And, to be fair, Mr. Sabelli,

14   probably should not have raised -- used the name without my

15   permission.

16        MR. FRENTZEN:  Thank you, your Honor.

17        THE COURT:  I'll grant you that much; but at least in

18   the recent question he did not.

19        The witness -- this -- they're not using the name.

20        What Mr. Sabelli is asking is:  Is it really true

21   that until five minutes ago you didn't know the real name of

22   1211?

23        I'd like to know the answer, too.

24        MR. FRENTZEN:  Well, that also assumes facts not

25   evidence in evidence.

```
 1              THE COURT:  That's what the witness seemed to be
 2    saying.  Let's find out.
 3              Is it true that until this morning, you did not know
 4    the real name of 1211?
 5              THE WITNESS:  No, that is not true.
 6              THE COURT:  All right.  Well, then, we misunderstood
 7    what you were saying.
 8              MR. SABELLI:  So when you said --
 9              THE COURT:  Wait.
10              MR. SABELLI:  I'm sorry.
11              THE COURT:  Any more objections?
12              MR. FRENTZEN:  Well, I'm still objecting, your Honor.
13    I'm not dropping my objection.  I'm not withdrawing.
14              THE COURT:  All right.  Your objection is overruled.
15              Go ahead, Mr. Sabelli.
16              MR. SABELLI:  And, by the way, your Honor, I can
17    double-check this, but this person's name has been used in
18    pleadings in this case that are not under seal.  I'm not going
19    to use it anymore.
20              THE COURT:  I don't think you should be using the
21    name of 1211 or 1218 without my permission, to be sure that
22    that's true, and that it's already in the public domain.  I'm
23    not sure, myself, if it is or isn't, so --
24              MR. SABELLI:  That's fine.  And I won't today, but
25    it's my memory --
```

1              THE COURT:  -- be more careful on that point.

2              MR. SABELLI:  I will, your Honor.

3         It's my memory that it's already in the public

4    domain.

5              THE COURT:  Well --

6    BY MR. SABELLI

7    Q.  So when you answered a few minutes ago, Mr. McDonnell,

8    because of the sequence of events, you now know his name?

9    A.  No.  If I can --

10   Q.  I'm sorry.  I haven't asked my question yet.  The reality

11   is you knew his name before I used it in open court?

12   A.  Correct.

13             MR. FRENTZEN:  Objection.  Assumes facts not in

14   evidence.

15             THE COURT:  You've done enough on that impeachment

16   material.  I want to get the more foundational material.

17         Move ahead.

18             MR. SABELLI:  Sure.  Thank you.

19   Q.  Let's focus on this person:  S.F. 1211.  Now, you know

20   that this person was an informant, was inside of MS-13 in

21   San Francisco, and was giving information to ICE?

22   A.  Correct.

23         Can I explain the rest of 1211, 1218?

24             THE COURT:  I think, yes -- if the witness wants to

25   do that.  So be careful not to reveal names, but go ahead and

1    make your statement.

2            **THE WITNESS:**  My statement about not knowing his name

3    is a direct reference to my testimony during this proceeding

4    earlier in my first appearance here with the first batch of

5    this, when I said I didn't know the names between 1218 and

6    1211; but I knew both.

7            And now that you're assigning a number to a

8    particular name -- that's what I'm meaning --

9            **MR. SABELLI:**  All right.  I understand.

10           **THE WITNESS:**  -- to differentiate between the two

11   when you're talking about it.

12   **BY MR. SABELLI**

13   **Q.**   You knew the names of 1211 and 1218, but you didn't know

14   which one was 1218 and which one was 1211?

15   **A.**   Correct.

16   **Q.**   Okay.  Let's focus on 1211.  And that's the person we've

17   been discussing this morning:  Do you have any doubt whatsoever

18   that you know who I'm talking about?

19   **A.**   No.

20   **Q.**   Okay.  Now, S.F. 1211 was somebody who you folks thought

21   was an MS member?

22   **A.**   Correct.

23   **Q.**   In fact he was, in your opinion as a gang expert back in

24   2008/2007, a leader of MS-13 in San Francisco?

25   **A.**   I don't believe he was leader.  Not to my knowledge.

1  Q.   To your knowledge as a gang expert, you do not believe

2  that S.F. 1211 was a leader of the 20th Street Clique in

3  San Francisco in 2007 and 2008?  Is that true?

4  A.   True.

5  Q.   Now, you knew him to be a member, at least, of MS-13?

6  A.   Correct.

7  Q.   And you knew him to give -- he -- by the way, did you ever

8  meet with him personally?

9  A.   I met him.

10  Q.   Now, I know you've said that you've spoken to him in

11  contacts on the street.

12  A.   Correct.

13  Q.   And how many contacts would that be?

14  A.   Two.  Maybe three.  Two.

15  Q.   Did he ever give you any information during those two --

16  maybe three -- contacts on the street that were -- that you

17  used in formulating your opinions here?

18  A.   No.

19  Q.   What sorts of things would you discuss with him on the

20  street when you met him on these two or three occasions?

21  A.   On those occasions, he was with others, so it was

22  basically his name and his information; date of birth; address.

23  Q.   Okay.  Did you ever meet with this person -- S.F. 1211 --

24  in any other context besides bumping into him on the street?

25  A.   Sure.

1    Q.    What contexts were those?

2    A.    He was present when we were getting ready to do a fed

3    operation with the inspectors or the agents that were

4    controlling here.

5    Q.    So at this point -- the point that you're referring to

6    now -- he was already an ICE informant?

7    A.    Correct.

8    Q.    And ICE allowed you to come and to interview him?

9    A.    No.

10   Q.    Or to attend an interview with him?

11   A.    No.

12   Q.    Okay.  Can you explain the circumstances?

13   A.    He was present as we'd gather and brief before an

14   operation.  And he was there.

15   Q.    Did he speak during this briefing?

16   A.    Not to me.

17   Q.    Did he speak to the group?

18   A.    No.

19   Q.    Did you hear him utter any words at all?

20   A.    No.

21   Q.    As an expert, do you know why he was present while an

22   operation was being planned?

23            MR. FRENTZEN:    Objection.  Calls for speculation.

24   Foundation.

25            MR. SABELLI:    No, your Honor.  He's an expert.  And

1   there was an informant at a preparation for some sort of police

2   operation.  I think it's a fair question -- why this person was

3   present.

4            **THE COURT:**  No.  I think that's just too far afield.

5   I -- this is just developing --

6            I think you ought to be -- stick more to what is the

7   foundation for the opinions that he gave, instead of developing

8   impeachment information for 1211 or 1218.

9   **BY MR. SABELLI**

10  **Q.**   Have you ever seen any memoranda written about information

11  given by 1211?

12  **A.**   I believe so.

13  **Q.**   And are those San Francisco memoranda, or ICE memoranda,

14  or FBI memoranda?

15  **A.**   The one I'm referring to -- I believe it was a

16  San Francisco memo written by Sergeant Lou Perez.

17  **Q.**   Sergeant Lou Perez?

18  **A.**   Correct.  I think it's already been discovered.

19  **Q.**   I'm sorry.  That has already been discovered?

20  **A.**   Right.

21  **Q.**   And that was written by Sergeant Lou Perez about

22  S.F. 1211?

23  **A.**   I believe -- I don't know if it was specifically about

24  him.  I believe it was his contact.  And I believe the context

25  of the memo was MS presence in San Francisco; particularly the

1    Tenderloin, I believe, at that time.

2    Q.   Now, the Tenderloin is not where the 20th Street Clique is

3    turfed -- is located?

4    A.   That's correct.  That is not their turf.

5    Q.   Okay, but this memo related to S.F. 1211, and to the

6    Tenderloin District?

7    A.   Correct.

8    Q.   Now, besides this one memo, did you see any other written

9    materials from any source about S.F. 1211 which you relied upon

10   in formulating your opinions?

11   A.   The police report that I wrote.  We took photos of all of

12   them in the park, I believe.  And there might have been an FI.

13        (Reporter interruption)

14           THE WITNESS:  FI.  A field interview.

15   BY MR. SABELLI

16   Q.   Have you seen any memoranda written by Mario Molina about

17   S.F. 1211?

18   A.   No.

19   Q.   Are you aware of whether or not Mario Molina, as a gang

20   expert, kept memoranda about informants in his desk?

21   A.   I don't know.

22   Q.   Have you ever discussed with Mario Molina whether or not

23   he keeps memoranda about informants anywhere?

24   A.   No.  I did not have that discussion.

25   Q.   Okay.  Now, with respect to 1218, have you seen any

1  written memoranda, reports, statements, anything about

2  S.F. 1218 which you relied upon as an expert?

3  **A.**   Yeah.  With him, it was police reports; FIs; my personal

4  contacts with him.

5       I don't recall -- I don't recall seeing any memos with

6  him.

7  **Q.**   And when you say "police reports" -- are those police

8  reports about S.F. 1218 that you authored, or that other people

9  authored?

10 **A.**   Both.

11 **Q.**   Both.  And by the way, in your opinion as a gang expert,

12 was S.F. 1218 -- was that person a leader of MS-13 in

13 San Francisco in the years 2007 and 2008?

14 **A.**   I don't know if he was a leader, but he was definitely

15 somebody with status.

16 **Q.**   Definitely somebody with status?

17 **A.**   Correct.

18 **Q.**   What do you mean by that?

19 **A.**   He had been around for a while.

20 **Q.**   So anybody who's been around for a while has status?

21 **A.**   Well, they have more status than a new one coming in.

22 They've established themselves within the gang, so their word

23 would carry more weight.

24 **Q.**   Is it your opinion, as an expert in MS-13 in

25 San Francisco, that S.F. 1211 was a leader in MS in

1  San Francisco in the years 2007 and 2008?

2          **MR. FRENTZEN:**  Objection.  Asked and answered.  He

3  moved back to 1211.

4          **MR. SABELLI:**  I meant 1218.

5          **THE COURT:**  All right.  Rephrase the question.

6  **BY MR. SABELLI**

7  **Q.**   Is it your opinion as a gang expert, referring to the

8  years 2007 and 2008, that S.F. 1218 was a leader of the

9  20th Street Clique in San Francisco?

10 **A.**   My understanding of him at the time was that he was a

11 well-established gang member that had been in whose word had

12 weight, and that he was involved.  And I believe he even had

13 discussions at meetings, you know.  So his weight was more

14 pronounced --

15 **Q.**   Now --

16 **A.**   -- but I don't believe he was the leader.

17 **Q.**   I'm sorry I.  Couldn't hear you.

18 **A.**   I don't believe he was the leader.

19 **Q.**   Are you saying he was a leader, but not the leader?  I

20 want to understand your answer.

21 **A.**   Well, you have a leader who's going to be, kind of, in

22 charge, you know, and controlling the subordinates, for lack of

23 a better description.

24     And then you have people with more weight and -- more

25 veterans, that have been their older brothers, et cetera, kind

1    of deal.  And then he was definitely one of them.

2    **Q.**   Okay.  Now, as a gang expert, when you receive information

3    from an MS member, does it matter to you what that person's

4    status is within the clique?

5    **A.**   Does it matter?  You have to take that into account.

6    **Q.**   You take that into account, for example, because somebody

7    who's been around for a long time might have more information

8    or better information?

9    **A.**   They may have more information or better information, but

10   they also may have more knowledge, and be able to give you more

11   historical references to lead up to a particular scenario, as

12   opposed to a new person coming in, who doesn't know everybody.

13   **Q.**   And they might have more crimes to conceal?

14   **A.**   Correct.

15   **Q.**   I'm sorry?

16   **A.**   Correct.

17   **Q.**   And so when you go through that process of evaluating

18   information you get by an MS member, to determine whether or

19   not you're going to give it weight as an expert, you should

20   take somebody's motivation for coming to you into account,

21   right?

22   **A.**   We do.

23   **Q.**   Okay.  And so the more crimes somebody has to conceal, the

24   more they want to avoid in terms of criminal responsibility,

25   you understand that they have a greater incentive to lie to

1  you?

2  **A.**    There's where you're kind of losing me.

3     Are they coming to me because they're in a hot spot and

4  they're giving me information, or are they giving me

5  information because they -- we talk to informants -- gang

6  members.  Most of them are criminals.  Most of them commit

7  crimes.  I don't know what their motivation is at the time when

8  they're going to talk to me.

9  **Q.**    Sometimes you just don't know their motivation?

10 **A.**    Correct.

11 **Q.**    By the way, with respect to S.F. 1218, in formulating the

12 opinions that you've articulated during these hearings, have

13 you relied on anything that 1218 has told you?

14 **A.**    Yeah, some.

15 **Q.**    Are you aware that S.F. 1218 encouraged somebody to lie to

16 a grand jury?

17          **MR. FRENTZEN:**  Objection.  Assumes facts not in

18 evidence.

19          **THE WITNESS:**  No.

20          **THE COURT:**  Well, the way to phrase that is to ask

21 whether he has any information one way or the other whether or

22 not that ever occurred.  That avoids the problem.

23          **MR. SABELLI:**  Sure.

24 **Q.**    Do you have any knowledge of whether or not S.F. 1218 --

25          **THE COURT:**  Don't say "knowledge."  That's Biblical.

1    That -- say "information."

2    **BY MR. SABELLI**

3    **Q.**   Do you have any information about whether or not --

4            **MR. SABELLI:**   Thank you for the guidance, your Honor.

5    **Q.**   Do you have any information about whether or not S.F. 1218

6    has ever encouraged another person to lie to a grand jury?

7    **A.**   No.

8    **Q.**   Do you -- you used the word *la garra* -- g-a-r-r-a --

9    during your testimony.

10   **A.**   Yes.

11   **Q.**   Do you know what that means in Spanish?

12   **A.**   *La garra*?

13   **Q.**   Yes.

14   **A.**   No.   I believe it's like war or something like that.   I

15   don't know.

16   **Q.**   G-a-r-r-a?   Do you know what -- I'm talking about the hand

17   signal that MS-13 uses.

18   **A.**   Is that pronounced differently?

19   **Q.**   However you pronounce it, do you know what it means in

20   Spanish?

21   **A.**   No.   Direct translation?   No.

22   **Q.**   Focusing on turf for a second, I may have misunderstood

23   you, but I had the impression from you are your testimony that

24   it is your opinion that gang turf in San Francisco has not

25   changed since the year 2000.   Did I get that right, or did I

MCDONNELL - CROSS-EXAMINATION / SABELLI                645

1    misunderstand you?

2    **A.**    I don't believe I said that.

3    **Q.**    What is your opinion?  Has gang turf changed in the city

4    of San Francisco with respect to *Norteños* and *Sureños* since the

5    year 2000?

6    **A.**    Since the year 2000?  I don't know.  I could speak from

7    2002, because that's when I went to the Mission.

8    **Q.**    Is it your opinion, since 2002, gang turf with respect to

9    *Norteños* and *Sureños* in San Francisco has not changed?

10   **A.**    Correct.

11   **Q.**    It's remained the same since 2002?

12   **A.**    Correct.

13   **Q.**    Okay.  What is the basis for your opinion that MS members

14   can drop out of MS?

15   **A.**    What the basis for my opinion?

16   **Q.**    Yes.

17   **A.**    Speaking with other law-enforcement sources; my training;

18   and then also I'm aware of some that have tried.

19   **Q.**    You're aware of some that have tried?

20   **A.**    Correct.

21   **Q.**    Are you aware of any that have tried and failed?

22   **A.**    I don't know if they failed yet.

23   **Q.**    Okay.  Are you aware of any that have tried, and been

24   punished as a result?

25   **A.**    For dropping out of MS?

1   Q.   Yes.

2   A.   I don't know.

3   Q.   How many examples of people trying to drop out of MS are

4   you basing your opinion on?

5   A.   Well, it's based on my training, you know.  So --

6   Q.   I'm going to stop you there, because I don't know what

7   that means when you say, "It's based on my training."  What in

8   your training supports this opinion?

9   A.   It supports my opinion by the expert that I'm speaking to

10  at the training at the seminar that's a representative from CDC

11  and other jurisdictions.

12  Q.   During the course of these hearings when you've said,

13  "based on my training," what you mean is you've been to a

14  seminar or something else, and you've learned this from another

15  expert?

16        MR. FRENTZEN:  Objection.  Vague as to "this opinion"

17  or "other opinions."  There are different kinds of training.

18        MR. SABELLI:  I'm asking this witness about how he

19  has used that word during these hearings.

20        MR. FRENTZEN:  For the whole hearing?

21        THE COURT:  All right.  Recognizing that you have

22  said this many different contexts during the testimony, can you

23  tell us whether or not the way Counsel just described it fits

24  each and every one of those circumstances?

25        THE WITNESS:  To some degree or another, the

1  training -- encompasses a lot.

2         So, yeah, because I'd be talking with multiple

3  experts, multiple agencies during different seminars.  So it's

4  encompassed all in the training.

5  **BY MR. SABELLI**

6  **Q.**  Now, last time you were here, you used the term

7  "associate."  Can you tell us what you meant by that?

8         **MR. FRENTZEN:**  I'm going to object, only in that, I

9  mean, if Counsel wants to scratch his earlier question -- he's

10  asked a question.  He then interrupted Sergeant McDonnell while

11  he was answering it to ask specifically about training.  I

12  don't want him to move on, and leave the record as it was.

13         **THE COURT:**  Interrupt the witness in the middle of an

14  answer.

15         **MR. SABELLI:**  No.  I appreciate that.  Thank you,

16  Mr. Frentzen.  So let's go back.  I lost my train there.  Let's

17  go back.

18  **Q.**  Can you continue your answer?  I interrupted you with the

19  word "train."

20  **A.**  No.  What's the question?

21         **THE COURT:**  Was it something like:  What were all of

22  the bases for various opinions?  And I can't recall the way it

23  was, so the court reporter will have to go back about eight or

24  nine questions.

25         **MR. SABELLI:**  Your Honor, I can -- I can't ask the

 1 question verbatim, but I can re-ask the question generally.  I

 2 asked you for --

 3          MR. FRENTZEN:  I'm going to ask that the question and

 4 answer be stricken.  I mean, if Counsel's going to interrupt

 5 the witness, then he's interrupting the witness, and he's got

 6 to deal with it.

 7          MR. SABELLI:  Your Honor, I can --

 8          THE COURT:  Well, wait, wait.  No.

 9          The court reporter, go back about eight or nine

10 questions.  It was the question immediately preceding the one

11 where Mr. Sabelli said, "I'm going to stop you right there."

12 Let's get that question back, and let the witness finish his

13 answer.

14          THE REPORTER:  (Record read as follows)

15              "How many examples of people trying to

16          drop out of MS are you basing your opinion

17          on?"

18          Is that the question?

19          MR. SABELLI:  Correct.

20          THE COURT:  Well, read that loud.  I didn't hear it.

21          THE REPORTER:  I'm sorry, sir.

22          Question by Mr. Sabelli.

23          (Record read as follows)

24              "How many examples of people trying to

25          drop out of MS are you basing your opinion

```
 1           on?"
 2           MR. FRENTZEN:  Your Honor.
 3           THE COURT:  That doesn't sound like --
 4           MR. SABELLI:  That was the question.
 5           And he started answering with training.  And that's
 6  why I interrupted him.
 7           MR. FRENTZEN:  Yeah.  There was a substantive
 8  question, your Honor.  I'm sorry.
 9           THE COURT:  All right.  Well, then read -- then read
10  -- what was the question immediately preceding, where
11  Mr. Sabelli said, "I want to stop you right there"?
12           THE REPORTER:  That was it.
13           MR. SABELLI:  That was it, your Honor.
14           THE REPORTER:  But there was more questioning, both
15  -- obviously -- before and after that.
16           THE COURT:  I can't hear you, court reporter.
17           THE REPORTER:  Okay.  I'll go a few questions prior
18  to that, if that's all right, your Honor.
19           (Record read as follows)
20           "QUESTION:  Okay.  Are you aware of any that
21            have tried, and been punished as a result?
22           "ANSWER:  For dropping out of MS?
23           "QUESTION:  Yes.
24           "ANSWER:  I don't know.
25           "QUESTION:  How many examples of people
```

 1              trying to drop out of MS are you basing your

 2              opinion on?

 3              "ANSWER:  Well, it's based on my training,

 4              you know.  So --

 5              "QUESTION:  I'm going to stop you there,

 6              because I don't know what that means when you

 7              say, 'It's based on my training.'  What in

 8              your training supports this opinion?

 9              "ANSWER:  It supports my opinion by the

10              experts" --

11              THE COURT:  Okay.  Thank you, Lydia.  All right.  We

12    now know what the record was.

13              Have you finished your answer?

14         MR. SABELLI:  The question was -- I was asking you

15    about examples.

16         THE WITNESS:  Yeah, but then you closed off the end

17    of it, "that had been punished."  So, phrased like that, I

18    don't know.

19         MR. SABELLI:  Okay.  So I'll ask again.

20    Q.   How many examples do you have as an expert in your mind

21    that support your opinion that MS members can drop out of

22    MS-13?

23    A.   I can think of one clearly off the top of my head.

24    Q.   Just one?

25    A.   That I can specifically say yes.

1    And then the rest are based on training, so I can't give

2    you a number on how many of those references.

3    **Q.**   All right.  So now I understand.  So your opinion that

4    people can actually drop out of MS -- get out of MS alive -- is

5    based upon one example you can think of, and things you've

6    heard from other people?

7    **A.**   Things I've learned from other people.  Correct.

8    **Q.**   All right.  Changing subjects, you used the term

9    "associate" last time you were in court.  Can you tell us what

10   you mean by that:  An associate of a gang?

11   **A.**   What was the reference for that?

12   **Q.**   You used it during your testimony last time.  You referred

13   to members and associates.

14   **A.**   Okay.  With an associate, in the context that I use it

15   when I'm describing gang members, as far as when determining

16   somebody's affiliation to a gang, whether they're associate or

17   they're an actual gang member, you make the determination that

18   somebody's associated with that gang, and that they have ties

19   to a particular gang; but we have yet to have enough to say

20   that they're a gang member.  So we're saying that they're

21   associated to that gang, as opposed to saying somebody is a

22   gang member.

23       So a lot of times, that's the reference to "associate to

24   the gang," because we have not yet completed a determination of

25   their level of involvement with the gang, or even determined if

1    they are a full-on gangster.

2    **Q.**    Okay.  All right.  I think I understand your answer.  So

3    as I understand it, an associate is a term that you use as a

4    law-enforcement officer when you don't have enough information

5    to validate somebody as gang member?

6    **A.**    Or to say that they're a gangster.  Correct.

7    **Q.**    What about an affiliate?  Is there something called an

8    "affiliate" of a gang, that's not quite a gang member?

9    **A.**    I don't know.  That's not a term I use, you know,

10   typically.

11   **Q.**    Now, I want to look at your Opinion Number 22.  Do you

12   have Exhibit 1 in front of you, sir?

13   **A.**    No.

14            **MR. SABELLI:**  May I hand it to the witness,

15   your Honor?

16            **THE COURT:**  Yes, you may.

17            **MR. SABELLI:**  I believe it's at pages 8 to 11, sir.

18            (Document displayed)

19   **BY MR. SABELLI**

20   **Q.**    And I believe it's labeled Opinion 22.  It's on page 11.

21        Tell me when you've had a chance to look at that.

22   **A.**    Okay.

23   **Q.**    All right.  Now, is it fair to say that in Opinion 22, you

24   are giving your opinion regarding the state of mind of gang

25   members and of individuals in the community?

1              MR. FRENTZEN:  Objection.  Calls for a legal

2   conclusion.

3              MR. SABELLI:  No, your Honor.  I'm asking this

4   witness what, as an expert, he thinks he's opining about.

5              MR. FRENTZEN:  It's also argumentative.  It has

6   nothing to do with the basis.

7              THE COURT:  Well, Counsel is trying to find out if --

8   if it is expressing an opinion about the state of mind.  And

9   then he'll go, I guess, to the basis for it; but the objection

10  is overruled.

11             THE WITNESS:  With regards to 22, it's a statement of

12  fact.  I mean, it's a byproduct of their acts.

13             And then how people perceive them is their state of

14  mind, as far as if somebody perceives them as more fierce and

15  intimidating, correct.

16  BY MR. SABELLI

17  Q.   Okay.  So it's your view of their state of mind?

18  A.   And how they articulate it to me.

19  Q.   Okay.  So what you're telling us is that gang members have

20  used these terms describing their state of mind?

21  A.   Not so much gang members; but community members.

22  Q.   So gang members haven't used those terms with respect to

23  Opinion 22?

24  A.   As far as "fearsome" or "intimidating," no.

25  Q.   Correct.

1      They haven't -- they haven't described their state of mind

2  in those terms to you?

3  **A.**    Correct.

4  **Q.**    But people in the community have?

5  **A.**    Correct.

6  **Q.**    Okay.  So 22 is based upon what people in the community

7  have told you about?

8  **A.**    You're asking for specific words that described that. the

9  "fierce" and "intimidating" -- they don't use those words.

10  **Q.**    What I'm asking is whether or not Opinion 22 is based upon

11  what the people in the community have told you about.

12  **A.**    Yes.

13  **Q.**    Do you have any examples that you can point us to with

14  respect to 22?

15  **A.**    With regards to them being intimidated by them?

16  **Q.**    Yes.

17  **A.**    Yes.

18  **Q.**    Okay.  Give me an example of somebody in the community who

19  has told you about feeling that they're intimidated because of

20  the acts that you describe in Opinion 22, without using their

21  names.

22  **A.**    In any call for service that comes in regarding gang

23  members or acts of violence, the calls come in that the victims

24  are fearful because they're gang members, and they're

25  intimidated by them being out there.  A lot of times you get

1   that in calls for service.

2       Meeting with victims or even doing callbacks to witnesses

3   or victims, they don't want to coöperate with the police,

4   because they're fearful and they're intimidated by the gang

5   members that are involved, or who they think are gang members,

6   even if they're not gang members that are involved that they

7   perceive to be gang members.  So numerous times.

8   **Q.**   Now, I want to ask you about something you said last time

9   on the basis of one of your opinions.  It's at page 518 of your

10  transcript.  Do you have a copy of your transcript?

11  **A.**   No.

12          **MR. SABELLI:**  Your Honor, may I give him a copy of

13  his transcript?

14          **THE COURT:**  All right.  Go ahead.

15          **MR. SABELLI:**  Does the Government have a copy?

16          Would the Court like this marked, or are we okay with

17  simply referring to it as a transcript of October 25th?

18          **THE COURT:**  It's part of the Court record.  You don't

19  need to mark it again.

20          **MR. SABELLI:**  Okay.  Thank you, your Honor.

21          (Document displayed)

22  **BY MR. SABELLI**

23  **Q.**   If you look at page 518, please, the second line -- and if

24  you'd like to start on the page before that, to remember what

25  you were answering, that's fine.  Tell me when you've had a

 1   moment.

 2   **A.**   Are we talking just the first paragraph?  How far down

 3   518?

 4   **Q.**   I'm going to ask you about the first paragraph.

 5   **A.**   Okay.  Go ahead.

 6   **Q.**   I want to understand what you meant by, "It's their nature

 7   to confront rival gang members."

 8             **MR. SABELLI:**  The Court does not have a copy?

 9             **THE COURT:**  Yeah.  I don't have a copy, but I

10   remember.  Go ahead.  I remember.

11             **MR. SABELLI:**  I have an extra copy.

12             **THE WITNESS:**  Do you want me to answer?

13             **THE COURT:**  Just one moment.

14        (Whereupon a document was tendered to the Court)

15             **THE COURT:**  Page, again?

16             **MR. SABELLI:**  518, your Honor.

17             **THE COURT:**  All right.  Please go ahead and answer.

18   **BY MR. SABELLI**

19   **Q.**   Okay.  My question is -- you told Mr. Philipsborn that,

20   quote, "It's their nature to confront rival gang members and

21   anybody that's receiving disrespect."

22             What did you mean by it?

23             And I will ask you about your basis in a second, but

24   what did you mean by:  It's in their nature to confront rival

25   gang members?

1  **A.**    Well, in gang culture, a rival gang member in a particular

2  gang territory is a sign of disrespect to that particular gang.

3          So reference to MS, a *Norteño* being at 20th and

4  Mission, or somebody wearing red at 20th and Mission or in the

5  area of 20th and Mission -- that is a sign of disrespect to

6  those *Sureños* that are in that area.

7          So part of their culture is to protect their area and

8  control it, with violence and intimidation.  And that is

9  challenging anybody that comes through that they perceive to be

10  a rival gang member.  So that is part of their culture -- is to

11  directly confront those people.

12  **Q.**    I'm interested in the word "nature."  Your last answer

13  focused -- really defined this opinion in terms of the culture.

14  So I think I understand your opinion now, and I'll move on from

15  it now.  So we can put that aside.

16      Last time we were here, do you recall that I pointed out

17  Guillermo Herrera to you?  Do you remember that?

18  **A.**    Yes.

19  **Q.**    And at the time, you couldn't remember having spoken to

20  him.  Have you -- is that fair?

21  **A.**    No.  That's not true.

22  **Q.**    You do remember having spoken to him?

23  **A.**    I said I remember speaking to him.  And I said I don't

24  remember him, because I couldn't recall his face because it had

25  been -- what? -- two years?

1    Q.   Okay.  Now, do you remember what the nature of your

2    conversation was with him?

3    A.   I don't recall specifically.  I believe it was either in

4    an FI or a police report.  I don't recall specifically.

5    Q.   Has anything you've given in the way of an opinion during

6    these hearings been based upon something that Mr. Herrera has

7    told you?

8    A.   I don't know.  Without looking at his alpha file, I don't

9    know.

10   Q.   Without looking at his alpha file, you can't tell us

11   whether or not your opinion might be based in part on

12   interactions with him?

13   A.   That is correct.

14        MR. SABELLI:   That's all I have for now, your Honor.

15   Thank you.

16        THE COURT:   All right.  Any other defense counsel?

17        MR. GOODMAN:   I'd like to ask some questions,

18   your Honor.

19        THE COURT:   All right.  Your turn.  Go ahead,

20   Mr. Goodman.  Just keep your voice up.

21        MR. GOODMAN:   I will.

22                      CROSS EXAMINATION

23   BY MR. GOODMAN

24   Q.   Good morning, Sergeant McDonnell.

25   A.   Hello.

1   Q.   Do you know who Erick Lopez is?

2   A.   I do.

3   Q.   Do you see him in the audience?

4   A.   Second row, third from the left.

5   Q.   Okay.  Have you had contacts on the street with him?

6   A.   Yes.

7   Q.   How many times have you spoken to him on the street?

8           MR. FRENTZEN:  I'm sorry, your Honor.  Mr. Goodman

9   moved on, but -- and I missed the identification, but I assume

10  it was an identification of his client, so I think the record

11  should probably reflect that.

12          MR. GOODMAN:  That's fine.

13          THE COURT:  Is that correct?

14          MR. GOODMAN:  That's correct.

15          MR. FRENTZEN:  Thank you, your Honor.

16  BY MR. GOODMAN

17  Q.   So you have had contact with him on the street.  Is that

18  correct?

19  A.   That's correct.

20  Q.   Is that in the context of field interviews?

21  A.   Some.  Correct.

22  Q.   Do you remember approximately how many times you've

23  encountered him on the street where you've done a field

24  interview with him?

25  A.   I don't recall specifically.

1   Q.   Do you recall generally?  Can you tell us generally how
2   many times?
3   A.   I don't know.  It's either I'm writing a police report
4   about him or an FI about him.  I couldn't tell you how many,
5   off the top of my head.
6   Q.   Okay.  Have you ever been to his -- to the residence that
7   he gave when he was arrested?
8   A.   Which residence?
9   Q.   1753 Fulton Street.
10  A.   Correct.
11  Q.   How did that come about?
12  A.   It was search warrant investigation.  I believe it was
13  related to his arrest.  And he was with -- who was he with?  He
14  was with --
15  Q.   Edgar Ramos?
16  A.   Yeah.  Erick was arrested trying to shove a gun through a
17  gutter.
18  Q.   This was on March 30th, 2008?
19  A.   I don't know the date.  That sounds about right.
20  Q.   Okay.  And then you executed a search warrant at
21  1753 Fulton Street on April the 3rd, 2008.  Is that correct?
22  A.   I don't know if that's the exact date, but it was very
23  shortly afterwards, correct.
24  Q.   And you were the affiant on that search warrant, right?
25  A.   I was.

1  Q.    That was in relation to a gun case.  Is that correct?

2  A.    Yeah.  I believe it was a .45.

3  Q.    And were you executing the search warrant as a member of

4  the Gang Task Force?

5  A.    What was it?  2008?  So yes.

6  Q.    Okay.  Did anyone ask you to do that search warrant?

7          MR. FRENTZEN:  Objection.

8          THE COURT:  Is this -- what has this got to do with

9  our hearing?  It sounds like an attempt to develop evidence for

10 suppression here.

11         MR. GOODMAN:  No, your Honor.  I'm asking him these

12 questions to show that Sergeant McDonnell has had contacts with

13 my client, both in the context of the facts of this case, and

14 evidence that he would provide in testimony as a fact witness.

15         And I'm also going to ask him some questions about

16 whether those particular facts were used in forming his

17 opinions.

18         MR. FRENTZEN:  Objection.  Relevance.

19         MR. GOODMAN:  I believe that this hearing --

20         THE COURT:  That is relevant.  I don't know whether

21 it's in the end going to turn out to amount to anything, but

22 the way Counsel described it, it does sound like it's the

23 purpose of today's hearing.

24         MR. FRENTZEN:  Stipulated that there was a search

25 warrant, and that he had contacts with him.

1          THE COURT:  Why isn't that enough?

2          MR. GOODMAN:  That's what I'm trying to establish:

3   The nature of his contacts with my client or his residence.

4          THE COURT:  But if the Government stipulates that all

5   of that happened, why do you need to keep going into it?

6          MR. GOODMAN:  I'm saying I don't.  If the Government

7   is willing to stipulate that that's the nature of that

8   particular involvement that the sergeant had with my client,

9   that's fine.  I'll move on to another --

10          THE COURT:  That's what Mr. Frentzen said, I think.

11          MR. GOODMAN:  That's fine.

12          THE COURT:  Mr. Frentzen, is that right?

13          MR. FRENTZEN:  We'll stipulate that he had contacts

14   with him in the street, and that he participated in a search of

15   his residence.

16          THE COURT:  Is that correct?  Is that enough?

17          MR. GOODMAN:  Yes.  On that occasion, yes.

18          THE COURT:  All right.  Let's move on.

19   BY MR. GOODMAN

20   Q.   Back in May of 2003, did you have occasion to receive

21   evidence that was allegedly taken from Mr. Lopez when he was

22   arrested at Everett Middle School for possession of marijuana?

23   A.   2003?

24   Q.   In 2003 when you were assigned, I believe, to the Mission

25   Station.

1  **A.**   I don't know.

2  **Q.**   If I was to show you a police report related to that

3  incident, could you review that, and might that refresh your

4  recollection?

5  **A.**   It certainly would help.

6         **MR. GOODMAN:**  Your Honor, may I approach the witness?

7         **THE COURT:**  Please go ahead.

8         (Document displayed)

9         **THE WITNESS:**  Thanks.

10  **BY MR. GOODMAN**

11  **Q.**   I've given you a copy of the report from the San Francisco

12  Police Department bearing the number 030514582.  And on page

13  four, at the bottom of that, would you review the last sentence

14  and tell me if that refreshes your recollection?

15         **MR. FRENTZEN:**  I just I don't happen to have this

16  document, your Honor.

17         **MR. GOODMAN:**  I've given a copy of the report to

18  Mr. Frentzen.

19         **THE WITNESS:**  Reading that sentence alone does not,

20  so I'm going to read the whole thing.

21         **MR. GOODMAN:**  Go ahead.

22         **THE WITNESS:**  Okay.

23  **BY MR. GOODMAN**

24  **Q.**   Does that refresh your recollection as to whether you

25  played some role in the arrest of Mr. Lopez on May the 2nd,

1    2003, for possessing marijuana?

2    **A.**    The star number's incorrect.  I vaguely remember that

3    incident.

4    **Q.**    Okay.  You were given some marijuana at that time by

5    another officer, correct?

6    **A.**    That's what it says in the report, yeah.

7    **Q.**    Does it refresh your recollection?

8    **A.**    Not really.

9    **Q.**    You have no recollection of it?

10   **A.**    No.

11   **Q.**    Okay.  And you said that you had field contact with him at

12   various points, is that correct, although you couldn't remember

13   how many?

14   **A.**    Yeah.

15          I need to make an observation on it.

16   **Q.**    Sure.

17   **A.**    My star number that's listed after the name is actually

18   not my star.  That's Sergeant Molina's star number:  1586.  So

19   that could be --

20   **Q.**    Okay.  Do you know if you were the officer, or not?

21   **A.**    I don't recall that.

22   **Q.**    Okay.  And I believe you said you had at least one

23   field-identification or field-interview contact with Mr. Lopez.

24   Is that correct?

25   **A.**    I would say more than one.

1  Q.   Okay.   In August of 2006, did you have occasion to respond

2  to a report of a theft of a computer, and have some role in

3  that particular incident?

4  A.   Yeah.   It's when he ran through Dolores Park with the

5  victims and witnesses chasing him.   And he was arrested, and

6  throwing up.   Yeah, I remember that case.

7  Q.   What was your role in that investigation?

8  A.   I believe it was Officer Carroll that actually handled

9  that report.   And I think I assisted him with that

10  investigation, so --

11  Q.   You assisted him in what way?

12  A.   I think taking Mr. Lopez into custody, and getting him

13  back to the station; because at that time it was pretty

14  distinct case.   He was profusely throwing up; and then denying

15  that he had stolen it.

16  Q.   Okay.   That was your role in that particular incident?

17  A.   From what I recall, yeah, I was assisting Officer Carroll.

18  Q.   And then in December -- actually, December 27th, 2007 --

19  did you play a role in the arrest of a man named "Espinal" for

20  possessing an illegal knife?

21  A.   Oscar Espinal?

22  Q.   Yes.

23  A.   Mission Playground?

24  Q.   I believe so.

25  A.   Large knife in his pants?

1  **Q.**    Correct.

2  **A.**    I believe I was involved somehow in that.  I think that's

3  Officer Espinoza's case, though.

4  **Q.**    And you detained Mr. Lopez relative to that investigation,

5  and eventually released him under 849 of the Penal Code.  Is

6  that correct?

7  **A.**    I believe so.

8  **Q.**    Okay.  Now, you have also played a role in making a

9  determination as to whether a particular individual is a gang

10  member.  Is that right?  Have you validated gang members?

11  **A.**    No.  I have gone to court and said that I believe they're

12  a gang member.  The validation comes through the Court; but

13  I've presented what I believed was evidence.

14           **MR. BERGER:**  Your Honor, the witness' voice is

15  dropping.

16           **THE COURT:**  Could you please keep your voice up?

17           **THE WITNESS:**  Sorry.  I presented evidence in court,

18  and the Court makes the validation.

19           So I presented evidence that I believe was sufficient

20  to say that a particular person was a gang member, correct.

21  **BY MR. GOODMAN**

22  **Q.**    To your knowledge, is there an alpha file on Erick Lopez?

23  **A.**    Yes.  That has been provided.

24  **Q.**    And, to your knowledge, did you make entries into the

25  alpha file under a heading of a document called, "Gang-Member

 1   Validation"?

 2   **A.**   Correct.

 3   **Q.**   Do you remember how many entries you personally made into

 4   that file?

 5   **A.**   No.  I did a lot of them.

 6   **Q.**   If I was to show you a copy of the gang-member validation

 7   for Erick Lopez, could you tell me after looking at that

 8   approximately how many entries you made?

 9   **A.**   Sure.  My star number should be on each one where I made

10   the entry.

11              **MR. GOODMAN:**  Do you have that?

12              (Pause in proceedings)

13              **MR. GOODMAN:**  For the record, I'm showing

14   Mr. Frentzen a copy of that before I show it to the witness.

15              Your Honor, I would like to show the witness a copy

16   of a document.  It appears to be the alpha file gang-member

17   validation for Erick Lopez.

18   **Q.**   Would you review that, Sergeant McDonnell, and tell me if

19   you recognize it?

20   **A.**   Yes.

21   **Q.**   For each of the entries in that file, is there a star

22   number for the person that entered it?

23   **A.**   Correct.

24   **Q.**   And are you the person that entered it?

25   **A.**   Yeah.  Looks like I made a typo on number five, and

1    inverted my number.

2    **Q.**    Okay.

3    **A.**    Yeah.  I did all of these entries.

4    **Q.**    And approximately how many entries did you make?

5    **A.**    Twenty-nine.

6    **Q.**    Okay.  Now, you've testified that, in your expert

7    capacity, you rely on not only what other people have told you,

8    but your own experiences with gang members.  Is that correct?

9    **A.**    That's correct.

10   **Q.**    So if you testify as an expert on MS-13 in this case, you

11   would be basing your opinions, in part, on the contacts you've

12   had with Erick Lopez; on the entries that you've made into this

13   file.  Is that correct?

14   **A.**    Do you have more?

15   **Q.**    Anything else?

16   **A.**    My contacts with Mr. Lopez; the entries I made into the

17   file.  And those entries are actually, like, thumbnails of the

18   reports that are reviewed.  And those are a summary.

19        That form that you've shown me that says gang validation

20   is a form that we generate in the office which assists an

21   investigator when they go to court when presenting a case.

22   It's a summary of every contact in there.  So it's the FIs; the

23   police reports.  If there was a memo that was find a jail

24   classification.  So that's what that form is, but it's directly

25   related to the original police reports or FI.

1  **Q.**   So every one of the entries, you had to review the

2  particular document, summarize it, and then put it or enter it

3  into the alpha file.  Is that correct?

4  **A.**   Yeah.  The alpha file is the police reports and the FIs.

5  **Q.**   Right.

6  **A.**   That summary when my star number appears on it -- that was

7  my opinion when I summarized that incident.  So that way, you

8  know who wrote down this information summarizing that event.

9       So you can get a different alpha file, which would have

10 somebody else's star number.  And then they would put it -- if

11 another officer reviewed that report, had more information

12 related for their own personal dealings with the subject, they

13 may add any additional information into that particular

14 contact, and they would change the star and make it theirs,

15 because now it's theirs.

16 **Q.**   I would like to ask you a couple of questions about what

17 you said about what Sergeant Molina told you concerning his

18 conversations with Manuel Franco.

19      You said that you had talked to Sergeant Molina, he had

20 indicated Franco provided some information about a homicide

21 either in 2007 and 2008.  Is that correct?

22 **A.**   That's not what I said.

23 **Q.**   Okay.  What did you say about the homicide in 2007/2008?

24 **A.**   That I know that the Homicide inspectors had been speaking

25 with Mr. Franco.

1   Q.   Uh-huh.  Oh, okay.

2   A.   So I know that they had a conversation with him.

3   Q.   Were the Homicide inspectors that you're talking about

4   Inspector Johnson and Inspector D'Amico?

5   A.   I don't know who took the lead on that.  I know that all

6   of them were -- not all of them -- most of them were involved.

7        So specifically which one -- I don't recall specifically

8   which one.

9   Q.   Do you recall if it was about a homicide on March 29th,

10  2008, involving two people, named "Joldic" and "Ng"?

11  A.   I don't recall the specific homicide they were talking

12  about.

13       I do recall the time period.  I do recall the time period

14  of the arrest, where he actually came into the picture and

15  surfaced, and where he ended up being involved with Homicide.

16  And that was directly made after a search warrant executed in

17  Daly City, so --

18  Q.   Okay?

19  A.   -- specifically what homicide?

20  Q.   Do you know how many times you were told by Homicide

21  inspectors that they had had contact and discussed --

22  discussions with Manuel Franco?

23  A.   How many times I was told?

24  Q.   Yes.  Was it multiple times that the inspector said they

25  had individual conversations with Manuel Franco?

1          MR. FRENTZEN:  Objection.  Vague.  I think it's

2 just -- are we talking number of times they had -- they said

3 they had contacts with Franco, or --

4          MR. GOODMAN:  Correct.

5          MR. FRENTZEN:  -- number of times he was told by the

6 inspectors that they had had --

7          THE COURT:  Please clarify.

8          MR. GOODMAN:  I'm talking about the first.

9 Q.   The number of times you had contact with the inspectors

10 where they said they had conversations with Manuel Franco?

11 A.   I only recall the one time that they were interviewing

12 Mr. Franco.

13 Q.   Okay.

14 A.   And you keep saying "Mr. Franco," but I think his alpha

15 file says "Manuel Franco-Hernandez."  So the full name is what

16 I know him by.

17 Q.   So it's a hyphenated "Franco-Hernandez"?

18 A.   Right.

19          MR. GOODMAN:  Thank you.  I have nothing further,

20 your Honor.

21          THE COURT:  Any more defense counsel?

22          Mark Vermeulen.

23                      **CROSS EXAMINATION**

24 BY MR. VERMEULEN

25 Q.   Good morning, Sergeant.

1  **A.**   Hello.

2  **Q.**   I'm Mark Vermeulen.  I represent Giovanni Hernandez.

3  **A.**   Yes.

4  **Q.**   Can you point him out?

5  **A.**   Back row; fourth over.

6  **Q.**   Fourth from the left; back row?

7  **A.**   Correct, next to Moris.

8          **MR. VERMEULEN:**  The record would reflect that that is

9  Giovanni Hernandez.

10 **Q.**   You've had contact with him before?

11 **A.**   I have.

12 **Q.**   How many times?

13 **A.**   I don't know.  Maybe six, seven.  Probably more.

14 **Q.**   What were the nature of those contacts?

15 **A.**   I believe the first time I met him, I was investigating a

16 stabbing on a Muni bus.  I think he was detained with

17 Edgar Rodriguez, as a juvenile.  At the time, they both were on

18 Mission Street, but then --

19 **Q.**   So let me stay with that one.

20      That's reflected in the alpha file for Giovanni Hernandez;

21 is it not?

22 **A.**   Sure.  I believe it is.

23 **Q.**   And Mr. Rodriguez was the suspect on that one.  In the

24 alpha file, the entry, and the reports, you note that

25 Mr. Hernandez was accompanying Mr. Rodriguez, correct?

 1  **A.**    Yeah.  I don't think Mr. Rodriguez was a suspect at the

 2  time.  And I think they were both just contacted.  I don't

 3  think either was a suspect of anything at the time.

 4  **Q.**    Okay.  So they just might have had information.  You

 5  wanted to contact them; see what information they had?

 6  **A.**    It was more like -- I think I didn't know them.  And I

 7  came up and I said, "Hello."

 8  **Q.**    Okay.  That was the contact?

 9  **A.**    Basically.

10  **Q.**    Okay.  Next contact?

11  **A.**    The "Valmori" tattoo down his arm.  That struck my

12  interest.  Valmori or -- I believe it was V-a --

13  **Q.**    V-a-l-m-o-r-i?

14  **A.**    I believe that is correct.

15  **Q.**    And did you later learn what that signified; what that

16  meant?

17  **A.**    No.

18  **Q.**    Do you know what his middle name is?

19  **A.**    No.

20  **Q.**    Next contact with him?

21  **A.**    I don't know.

22  **Q.**    Do you -- so you said that you had about seven contacts

23  with him, right?

24  **A.**    Yeah.

25  **Q.**    You said the first was as a juvenile.  You just walked up

 1  to him, talked with him for a while, walked away.  No problems?

 2  **A.**   Right.  I believe that was the first time I met him.

 3       After that I met him in Mission Playground.  I met him at

 4  20th and Mission, but there were a few other contacts I don't

 5  recall specifically.

 6       And then I think I did a search warrant at his house for

 7  his brother, because --

 8       Well, we're going to get into that?

 9  **Q.**   Sure.  Let's go into that now.

10       Who's his brother that you're referring?

11  **A.**   His brother is Joel Hernandez.

12  **Q.**   Okay.

13  **A.**   Do you want me to go further?

14  **Q.**   Sure.

15  **A.**   Okay.  Joel Hernandez is a *Norteño*.  He's a 21 ABL

16  *Norteño*.  And so we went to his house on a search.

17  **Q.**   Okay.  "His house."  When you say "his house," what's the

18  address?  Do you remember?

19  **A.**   960 Ingerson.

20          **MR. FRENTZEN:**  Objection.  Relevance.

21          **THE COURT:**  What's the relevance?

22          **MR. VERMEULEN:**  Previous contacts, your Honor, with

23  him.  He's going to be testifying as a fact witness, or at

24  least he's being proposed to testify as a fact witness

25  concerning my client.

```
 1            He's also proposed --

 2            THE COURT:  What's that got to do with his expert

 3   opinions?

 4            MR. VERMEULEN:  He's also using that same information

 5   as an expert witness.  I'm going to be trying to determine

 6   which is which, if he can determine which is which.

 7            I'm also finding out what he knows concerning the

 8   basis of his expert opinion, which includes his contacts with

 9   my client.

10            THE COURT:  What's wrong with that?

11            MR. FRENTZEN:  That's not questioning the basis,

12   your Honor.  He knows what he's going to be testifying to as an

13   expert, because we've already disclosed it to him and we've

14   gone through it.

15            And so he can figure out for himself when he's going

16   to be fact and when he's going to be expert.  This has

17   nothing -- I mean, these specific instances -- this has nothing

18   to do with the basis for his opinion.

19            THE COURT:  Well, let's find out if he does, or not.

20            MR. VERMEULEN:  Are you basing your --

21            THE COURT:  Objection overruled for now.

22            Please continue.

23   BY MR. VERMEULEN

24   Q.   In stating your -- if giving testimony as an expert

25   witness, are you excluding from that testimony all of your
```

 1  contacts with Giovanni Hernandez?

 2  **A.**    No.

 3  **Q.**    Are you including in your expert-opinion bases your

 4  contacts with Giovanni Hernandez?

 5  **A.**    In my expert opinion regarding MS and Mr. Hernandez --

 6  yeah, I'm including everything I know.

 7  **Q.**    Right, including the contacts concerning 960 Ingerson,

 8  I-n-g-e-r-s-o-n?

 9  **A.**    The search warrant at Ingerson actually was a search

10  warrant for him.  And he wasn't home.  And Joel was home at the

11  time.

12  **Q.**    When you say a "search warrant," are you talking about a

13  warrant that directs you and officers to search a location, or

14  are you talking about a warrant that directs you to arrest a

15  person?

16          **MR. FRENTZEN:**  Object to the relevance, your Honor.

17  If he wants to talk about the interactions, talk about the

18  interactions.

19          **MR. VERMEULEN:**  I'm trying to get clarification of --

20          **MR. FRENTZEN:**  Excuse me.  The basis of the search

21  warrant is irrelevant.

22          **MR. VERMEULEN:**  I'm not looking at the basis.  I'm

23  trying to get clarification.  When he says, "We're executing a

24  search warrant for him" -- is that a search warrant for a

25  location, or is that a search warrant for an arrest?

 1              THE WITNESS:  I'm sorry I wasn't clear.

 2              It's a search warrant for his residence.  When I say

 3    "for him" -- he was the subject of that investigation.  So the

 4    search warrant was for his house; not an arrest warrant.

 5    BY MR. VERMEULEN

 6    Q.   So the warrant specified 970 Ingerson.  That's what you

 7    went to search?

 8    A.   I believe that's accurate.

 9    Q.   Do you remember what you found there?

10              MR. FRENTZEN:  Object.  Relevance.

11              THE COURT:  What's the relevance?

12              MR. VERMEULEN:  The evidence that he or other

13    officers found there is information that he would testify to as

14    a fact witness in the case.

15              I believe it also informs his opinion and the bases

16    for his opinions as an expert witness.

17              THE COURT:  Is that true?

18              THE WITNESS:  I'm sorry.

19              THE COURT:  Did you find anything there at the house

20    that is the basis of any of your opinions?

21              THE WITNESS:  Yeah.  I believe there was indicia

22    there.  I'd have to look at the report to recall exactly, but I

23    believe there was a flag or something like that; a Salvadoran

24    flag on the wall.

25              I believe my conversation with his brother was

1   relevant, because his brother's a *Norteño*.  And I was inquiring

2   about how they can get along in the house without killing each

3   other.

4           And, without looking at the report to see what other

5   stuff was found, I believe there was a lot of shotgun shells

6   that might have been recovered in that same incident.

7   **BY MR. VERMEULEN**

8   **Q.**   If I were to provide you with a copy of the SFPD Incident

9   Report Number 080849066, reflecting type of incident:

10  Search-warrant service on 8/20/08.  Might that help your

11  recollection?

12  **A.**   Definitely.

13          **MR. VERMEULEN:**  If I may, your Honor.

14          **THE COURT:**  Yes.

15          (Document displayed)

16          **MR. VERMEULEN:**  You bet.

17          **THE WITNESS:**  Yes.

18  **BY MR. VERMEULEN**

19  **Q.**  Does that report accurately reflect what you did, along

20  with the other officers, to serve the search warrant on

21  August 20th of '08 at 970 Ingerson?

22  **A.**   I was looking at the property that approves the narrative.

23          **MR. FRENTZEN:**  Objection to the form of question,

24  your Honor.

25          **THE COURT:**  What's the problem with the form?

```
 1              MR. FRENTZEN:  He's asking whether or not it's
 2   correct as to his activities and everybody else's activities.
 3   There's no foundation.  And he's just laid a document in front
 4   of him.  If he wants to refresh, that's fine.  And he can go
 5   from there.
 6              MR. VERMEULEN:  All I'm asking is whether what he
 7   wrote down there is accurate.
 8              THE COURT:  Well --
 9              THE WITNESS:  Yes.
10              THE COURT:  Well, is it accurate, to the best of your
11   knowledge?
12              THE WITNESS:  Yes.
13              THE COURT:  All right.  Go ahead.
14              THE WITNESS:  And in retrospect to your other
15   question, yeah, there is items that I'm using as well to base
16   my opinion.
17              MR. VERMEULEN:  Okay.  Thank you.
18              THE COURT:  Is that it?
19              MR. VERMEULEN:  No, it's not.  I'm sorry, your Honor.
20              THE COURT:  I thought you were about to wrap it up.
21   All right.  Go ahead.
22              MR. VERMEULEN:  Couple more.  Two more areas.
23              THE COURT:  Sure.  Go ahead.
24   BY MR. VERMEULEN
25   Q.   You've also had a hand in producing the alpha file for
```

 1  Giovanni, have you not?

 2  **A.**    Yes.

 3  **Q.**    Might I put a copy in front of you, so you can review it,

 4  so we're talking about the same thing?

 5  **A.**    Thank you.

 6              **MR. FRENTZEN:**  Thanks.

 7              **MR. VERMEULEN:**  You bet.

 8              (Document displayed)

 9              **THE WITNESS:**  Go ahead.

10  **BY MR. VERMEULEN**

11  **Q.**    Have you reviewed it?

12  **A.**    Yes.

13  **Q.**    How many entries are there IN Mr. Hernandez' alpha file,

14  as of the date that it was printed?

15  **A.**    Twenty-two.

16  **Q.**    And who made the entries as to every one of those entries

17  in the alpha file?

18  **A.**    I did.

19  **Q.**    And is your method for entering the information similar to

20  what you described in connection with Mr. Lopez when he was

21  talking with Mr. Goodman?

22  **A.**    Yeah.  The evolution of these or creation of these starts

23  with running out, doing computer queries on any particular

24  individual, getting as much or all of the history we can on

25  that person, reviewing each contact, each incident, and each FI

1   each memo -- whatever -- and then summarizing those in

2   chronological order.  And then --

3   **Q.**   Okay.

4   **A.**   -- put them down here to refer to.

5   **Q.**   When you record something in the alpha file, and it's also

6   labeled at the top "Gang-Member Validation" --

7   **A.**   Sure.

8   **Q.**   -- does that mean that each of those entries is relevant

9   to validating that person as a gang member?

10  **A.**   No.  This is -- it goes in their alpha file, and goes to

11  our validation efforts in court.

12      So we call it a "Gang Validation Form."  And that is just

13  what it's always been called.

14  **Q.**   When you refer to validation in court -- and you used that

15  term a little earlier -- are you typically referring to the 11

16  specific categories that are set out in connection with the

17  Penal Code violation of 186.22?

18  **A.**   No.  Let's see if I can explain it.

19      The 11 criteria that we use at the Gang Task Force are in

20  line with the same characteristics.  They're criteria that are

21  used throughout California.  There may be a slight variation in

22  verbiage, and maybe they have additional, or not.

23      It's information that we'd put together.  And then when we

24  bring it to court, it's referencing the contacts that they had

25  and that we're documenting, and how they relate to 186.22(e) of

1  Penal Code, and then how they qualify as a gang member:  Either

2  the crimes they're involved with, which some of these contacts

3  are relevant to -- and then the rest are the reasons that we're

4  saying they're a gang member; be it the associations, the

5  locations they're contacted, the tattoos that they have, a

6  self-admission, jail classification.  I guess a CRI or CI has

7  told us, or even an untested informant, like a school counselor

8  or a parent, you know.  All of that information is cumulated

9  together and presented when we're testifying, to present why we

10  think somebody is a gang member, or a crime -- a particular

11  crime is a gang-related crime.

12  **Q.**   Okay.  Take a look at his --

13           **MR. VERMEULEN:**  I'm not going to go through all of

14  them, your Honor.

15  **Q.**   But take a look at entry number one on page one.  If you

16  could, review the summary of incident there.

17  **A.**   Mm-hm.  Sorry.  Go ahead.  Yes.

18  **Q.**   That pertains to a missing-persons report, where it

19  appears from that, that Giovanni ran away from home for a day,

20  right?

21  **A.**   Correct.

22  **Q.**   Anything about that, that leads you to believe that he's a

23  gang member?

24  **A.**   In that particular contact?

25           **MR. FRENTZEN:**  Excuse me.  Objection.

1          MR. VERMEULEN:  Yeah.

2          MR. FRENTZEN:  Relevance, only because this witness,

3    for our purpose, is not opining as to whether or not any of

4    these individuals are gang members.

5          THE COURT:  What do you say to that?

6          THE WITNESS:  He's not -- the witness, at trial, will

7    not be giving an opinion as to whether or not anyone is a gang

8    member; at least, on direct examination.

9          MR. VERMEULEN:  Let me -- let me ask it a little bit

10   differently, then.  I'll withdraw it.  Let me ask it a little

11   bit differently.

12   Q.   In stating your opinions as a gang expert, do you rely on

13   the information in the alpha file, where there are boxes

14   checked for criteria for validating gang members?

15   A.   Yeah.  I think the best way to answer that is:  All of the

16   police reports and all of the FIs that we can find, any

17   information that we can find, would go into the alpha file; but

18   that's not to say that every contact is a gang-related contact,

19   like the one you're referring to as -- he's a runaway; but it's

20   a contact showing the contact that the police then -- whatever

21   that contact was.  And it's basically just to include

22   everything we find on any individual.

23         Sometimes on a runaway, the report -- the parents may make

24   a statement about their concerns about their child, one way or

25   another; either drug related, or hanging out with particular

 1  people they're not fond of, or whatever kind of gang activity.

 2  So all of it is relevant in the alpha file, regardless whether

 3  they're ever going to use it in an opinion to say they're a

 4  gang member.  It's based on each individual contact.

 5  **Q.**   Understood.  Thank you.

 6       And you make the entries in the alpha file:  22 for

 7  Mr. Hernandez; 29 for Mr. Lopez?

 8  **A.**   Mm-hm.

 9  **Q.**   Are you making those entries in your expert capacity, or

10  are you making those entries in your capacity as a nonexpert,

11  an investigator, an officer?

12            **MR. FRENTZEN:**  Objection.  Relevance.  And it just

13  doesn't make sense.  Why does he got to be that -- I mean --

14            **MR. VERMEULEN:**  If -- if that's his answer, it can be

15  his answer, but it should be provided by him.

16            **THE COURT:**  No.  He's only been designated.

17            I'm going to sustain that objection, because I doubt

18  very much that in his --

19            Do you understand the question?

20            **THE WITNESS:**  I believe I do.

21            **THE COURT:**  All right.  Go ahead and try to answer

22  it.

23            **THE WITNESS:**  The alpha files are created by me.  In

24  this particular case, I created, I believe, thirty-something,

25  maybe.  Maybe more.

1          And then directly related to my expertise with MS,

2    but also because I've got the dubious honor of being the last

3    guy standing to take all of this info and do it.  And so I read

4    all of the reports and summarized each one; but then any time

5    we go to testify in court regarding -- sorry -- relating to

6    anybody's gang membership or a gang crime, if we're going to be

7    testifying as an expert, we will create an alpha file prior to

8    that for each individual, be it *Sureño*, *Norteño*; but I did not

9    create these when I was at Mission.  I didn't do these until I

10   got to Gang Task Force.

11   **BY MR. VERMEULEN**

12   **Q.**   Okay.  Do you have your -- the summary of your proposed

13   testimony with your numbered opinions in front of you?

14   **A.**   Yes.

15   **Q.**   Could you take a look at Opinion 20, please, page number

16   10, at the bottom?

17   **A.**   Go ahead.

18   **Q.**   You can refer to the entirety of that stated opinion.  I

19   want to focus on the last two sentences, where it says,

20              "Thus, coöperation with law enforcement

21         for any reason is a cardinal sin for a gang

22         member.  Violation of this rule results in

23         being 'green-lighted' or being authorized

24         to be killed."

25         Correct?

 1   **A.**   Correct.

 2   **Q.**   When you talk about "coöperation with law enforcement,"

 3   are you talking about any type of coöperation?  Are you only

 4   talking about formal, signed-up CI or CRI coöperation?  Where

 5   on that spectrum are you referring to when you talk about

 6   "coöperation with law enforcement" in Opinion 20?

 7   **A.**   In gang culture in MS, any coöperation is not permitted,

 8   you know.  So if they're a victim, then you're just a victim,

 9   but you're not talking.  You know, if you're a suspect, you're

10   not going to talk.  If you have a co-defendant case, you're not

11   saying nothing -- is the rule.

12        You know, it does not always come to pass, because a lot

13   of them talk.

14   **Q.**   Okay.  And would you include, then, in your coöperation

15   umbrella their being interviewed, or subjecting yourself to an

16   interrogation if you are arrested?

17   **A.**   Correct.  Yeah.

18   **Q.**   Okay.  Thanks.

19   **A.**   Yeah.  Coöperation is any conversation with the police.

20   So when you're arrested, or if there's an investigation going

21   on and you're coöperating with the police, either you're

22   detained and they're interviewing you and you're coöperating --

23   that's not accepted; but, that said, I don't know how many

24   times I've spoken with the defendants -- not all, but most --

25   and had casual conversations with them on the street, and then

1   sometimes would ask about different scenarios, you know,

2   regarding things that have happened.  Some of their friends

3   that have died, you know, or were killed.  You know, I would

4   inquire about that, and we would have conversations related to

5   that.

6          So the coöperation is more when you're coöperating with an

7   investigation, but I don't think what they grasp is that any

8   time they're talking to a police officer, in some way or

9   another, there's an investigation, because we're detaining

10  them, so --

11  **Q.**   Okay.  So there you seem to draw a fairly distinct line

12  between casual encounters on the street where you're talking

13  about folks and then it ends, and what happens -- the kind of

14  contact that happens if a person gets arrested or taken down to

15  the station.  Fair to say?

16  **A.**   Well, the difference is when they get arrested and they go

17  to the station, their perception is that there is some sort of

18  penalty coming either for them or their friend, you know.

19         And then also if they're arrested and they're a victim and

20  it shows up on paper in an investigation, maybe related to a

21  rival gang member, well, then that goes to the "being seen on

22  paperwork," you know, for a report, a crime, or some other form

23  of papers during an investigation, which may just kind of shine

24  a disparaging light on the gang, because they now -- maybe

25  they're perceived as weak, because now they're coöperating with

 1   the cops; they're talking to the cops.

 2        But when I speak to them on the street, a lot of it was

 3   casual conversations; but the other thing about the gang

 4   culture is its core value is the respect, you know.  And when

 5   you're speaking with gang members, you're not speaking at them.

 6   If you're speaking at them, you're going to get a wall and

 7   they're going to stare at you, and you're got going to get much

 8   rapport at all with them; but a lot of times you talk to them,

 9   you build a rapport with them, you chat with them, and a lot of

10   times the conversations could wander all over the place -- a

11   casual conversation.

12   **Q.**   In casual conversation on the street, where somebody's not

13   in custody?

14   **A.**   Correct.

15             **MR. VERMEULEN:**  Okay.  Thank you.

16             THE WITNESS:  Mm-hm.

17             **THE COURT:**  All right.  Done?  Any more defense

18   counsel?

19             **MR. NELSON:**  Yes, your Honor.  I have some questions.

20             **THE COURT:**  One question?

21             **MR. NELSON:**  Some questions.  I'll try to be brief,

22   your Honor.

23             **THE COURT:**  All right.  Go ahead.

24             **MR. NELSON:**  Jason Nelson, on behalf of

25   Danilo Velasquez.

<b><u>CROSS EXAMINATION</u></b>

**BY MR. NELSON**

**Q.**   Good morning, Officer McDonnell.

**A.**   Good morning.

**Q.**   Would it be fair to say that most of your expert experience relates to MS-13 gangs locally?

**A.**   Yes.

**Q.**   And specifically, San Francisco?

**A.**   Correct.

**Q.**   Do you have any familiarity with any other Northern California cliques?

**A.**   Of MS?

**Q.**   Yes.

**A.**   I've had some experience with the PLS; the Pasadena *Loco Sureños*.

**Q.**   That's based in Richmond, correct?

**A.**   Correct.  Actually, based out of Southern California. They have a clique in Richmond.

And then there were some members that were associated with the 20th Street as well, in San Francisco.

**Q.**   Would it be fair to say that the Northern California chapter of PLS is based in Richmond?

**A.**   Yes.

**Q.**   I believe you talked earlier about mentality of gang culture; psychological underpinnings; things like that?

1    **A.**   I don't think I used that word, but yeah.

2    **Q.**   Would "gang mentality" be a term a good term to use?

3    **A.**   Correct.

4    **Q.**   Did you base any of your expert opinions on any

5    discussions that you had with any psychologists who were,

6    themselves, experts in gang culture?

7    **A.**   Not my conversations.  I mean, I've sat in on different

8    defense experts that were psychologists.

9    **Q.**   Have you been any seminars or any psychologists went into

10   discussions about gang mentality?

11   **A.**   I'm trying to recall if there was psychologist present.  I

12   don't recall.  The closest thing I can thing of would be the

13   juvenile-justice panel.  I believe they had somebody from

14   everywhere.  I don't know.

15   **Q.**   Very well.  Now, we've talked earlier about the alpha

16   files.  And that is a series of files maintained by the Gang

17   Task Force, correct?

18   **A.**   It's -- the alpha file is the summary of all of the police

19   reports that are retained by the Police Department, yes.

20   **Q.**   And a fair number of the defendants in this case have

21   alpha files with the SFPD, correct?

22   **A.**   You want me to wait for him to be able to hear

23   (indicating)?

24             **MR. NELSON:**   Sure.  Apparently, we're having

25   technical difficulties.

```
 1              (Pause in proceedings)

 2              THE WITNESS:  I'm sorry.  One more time.

 3    Q.   I was asking questions about alpha files, and the

 4    defendants in this case.

 5         Do you know what percentage of these defendants have alpha

 6    files with the SFPD?  An estimate?  A quarter?  Half?

 7    A.   More than half.  I'd say ninety-something percent.  I

 8    don't know if Daniel Portillo has one, because I don't believe

 9    we had much locally on him.  So almost all, I believe.

10    Q.   And some of your expert opinions are based on those alpha

11    files, correct?

12    A.   Yes.  Well, no.  It's police reports that are reviewed

13    that are related and summarized in those alpha files.

14    Q.   And that's -- the alpha files, themselves, are summaries,

15    correct?

16    A.   Yeah, the alpha files are a summary.  The best description

17    of an alpha file is:  It's the arrest record, the local arrest

18    record, a CI extract, maybe photos that we have related to a

19    particular subject, and then a summary form that we do, which

20    lists chronologically all of the police reports and field

21    interviews and memos that are related to that particular

22    subject.  And then the police reports and the FIs are still

23    maintained by the record-management system.

24    Q.   At any given point, how many people are responsible for

25    inputting these alpha files or creating these alpha files?
```

1   **A.**    All of us in the office.  The Gang Task Force are the ones

2   that generate those alpha files.  And they're based on police

3   reports that are generated by other officers in the Police

4   Department.

5   **Q.**    And do you know my client, Danilo Velasquez, personally?

6   **A.**    I do.

7   **Q.**    Do you know him by name?

8   **A.**    Danilo?  Yes.

9   **Q.**    Yes.  And do you know him by face?

10  **A.**    Yes.

11  **Q.**    Could you point him out for us, please?

12  **A.**    He's in the first row, fourth over, between Luis and Ivan.

13          **THE COURT:**  Is he correctly identified?

14          **MR. NELSON:**  Is it fourth from the left?

15          **THE WITNESS:**  Yes.

16          **MR. NELSON:**  Yes.

17          **THE COURT:**  All right.  Thank you.

18  **BY MR. NELSON**

19  **Q.**    Do you have any recollection of whether or not you created

20  an alpha file for Mr. Velasquez?

21  **A.**    I believe I did.

22  **Q.**    Would it refresh your memory if I showed you what I

23  believe is his alpha file?

24  **A.**    Yes.

25          **MR. NELSON:**  Your Honor, may the record reflect I'm

 1  showing a copy to Counsel?

 2          **THE COURT:**  Thank you.  Go ahead.  You may show it to

 3  the witness.

 4          Is it marked?

 5          **MR. NELSON:**  It's not marked, your Honor.  I don't

 6  believe you'll need to.

 7          May I approach?

 8          **THE COURT:**  If you don't need to, go ahead.

 9          (Document displayed)

10  **BY MR. NELSON**

11  **Q.**   Officer McDonnell, can you please take a look at this

12  document?

13  **A.**   Go ahead.

14  **Q.**   And can you confirm that there are approximately 20 --

15  there are 20 entries in this alpha file?

16  **A.**   Yes.

17  **Q.**   And for each of the entries, it's entered by Star Number

18  1963.  Can you confirm that that is your star number?

19  **A.**   Yes.

20  **Q.**   So you did, in fact, make this alpha file, correct?

21  **A.**   Yes.

22  **Q.**   Do you have specific recollection of any of these

23  incidents in here?

24  **A.**   Probably.

25  **Q.**   Or any that you can point out, sitting here today, that

 1  you can remember?

 2          **MR. FRENTZEN:**  Objection to the relevance, as to what

 3  he does and doesn't specifically recall, sitting here today.

 4  How is that relevant?

 5          **MR. NELSON:**  Well, your Honor, as he testified that

 6  he did base some of his expert opinions on the alpha file -- so

 7  I'm trying to find out what he remembers specifically about

 8  Mr. Velasquez' alpha file.

 9          **MR. FRENTZEN:**  He said he created the alpha file.

10  Who cares, as he sits here today, which ones he does and

11  doesn't recall?  I don't see how that's relevant.

12          **THE COURT:**  Well, it's relevant to know the quality

13  of the witness' ability to remember how he came to various

14  conclusions, and the strength of the material that he relied

15  on.

16          I think it is relevant, but I do -- I think we are

17  repeating ourselves and reaching a Rule 403 point, where this

18  is cumulative.  So why -- why -- why don't you ask him -- I'll

19  let you ask him about one item on there, and whether he

20  actually remembers it; but we could be here -- we could be here

21  a long time if you go down this path.  So pick out whichever

22  item you want to ask him about, and then we're going to -- I

23  think we're at the end.

24          **MR. NELSON:**  Very well, your Honor.

25  Q.   Officer McDonnell, pointing to your direction to Number

1  Three -- Entry Number Three -- the day of event is 3/9/2005.

2  Do you see that?

3  **A.**    Yes.

4  **Q.**    Could you -- do you remember here today what that incident

5  was about?

6  **A.**    It was at 20th and Mission.  A school resource officer,

7  Steve Perez, who witnessed Mr. Velasquez and another

8  individual, "Happy," from MS, Juan Velasquez, at the corner

9  of -- I believe it was Mission and 20th, throwing hand signs,

10 gang signs at the bus traveling on Mission Street.

11        And I believe Mr. Velasquez, "Happy," was throwing

12 batteries at the bus.  And I think I wrote the report on that.

13        And then later that report was brought up in a case in, I

14 believe, San Mateo, where Mr. Velasquez was tried for attempted

15 murder there -- stabbing an individual there -- and convicted.

16 **Q.**    And when you say "Mr. Velasquez," can you please specify,

17 since they're both Mr. Velasquez?

18 **A.**    One's Vasquez.  The other one's Velasquez.  So "Happy" was

19 the one that was throwing the stuff at the bus.  And your

20 client, "Triste," was present.

21 **Q.**    And you know my client as "Triste"?

22 **A.**    Yes.

23 **Q.**    And would it refresh your memory to look at the incident

24 report for that particular incident?

25 **A.**    If you give me extra, but yes --

 1              **MR. FRENTZEN:**  I don't think anything needs to be

 2    refreshed.  I mean, that --

 3              **THE COURT:**  It's true.

 4              **MR. FRENTZEN:**  I let it go before, because I want to

 5    get through this.

 6              **THE COURT:**  He hasn't said he doesn't remember

 7    anything, so --

 8    **BY MR. NELSON**

 9    **Q.**   Officer McDonnell, your memory that one of the people that

10    was involved in that incident was Velasquez, and the other,

11    Vasquez?

12    **A.**   Right.

13    **Q.**   If you look at the entry on number three, it says

14    "Velasquez" as to both.

15    **A.**   Yeah, but it's "Happy."

16    **Q.**   Is it still your memory that one is Velasquez, and one is

17    Vasquez?

18    **A.**   Well, if you look in Mr. Danilo Vasquez' name on the front

19    sheet, he had a tendency to use both.  And it's listed as an

20    a.k.a. for him as well.  He uses Danilo Velasquez,

21    Danilo Vasquez, Arturo Velasquez.

22    **Q.**   Right, but his main entry is "Danilo Velasquez," correct?

23    **A.**   In that contact, correct.

24    **Q.**   As well as the entry number three, correct?

25    **A.**   Correct.

1  Q.   And what I'm asking is:  Do you remember specifically from

2  the incident report whether he's referred to as "Velasquez" or

3  "Vasquez" in the incident report?

4          **MR. FRENTZEN:**  How is this relevant?  We're way off

5  track here.

6          **THE COURT:**  What are we trying to do?

7          **MR. NELSON:**  I'll leave it be, your Honor.

8          **THE COURT:**  All right.

9  **BY MR. NELSON**

10 Q.   You referred to Mr. Velasquez -- my client,

11 Danilo Velasquez -- as "Triste."  Is that right?

12 A.   Correct.

13 Q.   You do know him according to that moniker?

14 A.   Yes.

15 Q.   And in general, do -- as an expert, do gang monikers mean

16 anything?  Are they based on a person's history, for example?

17 A.   Well, they could be based on a few different things.

18 Sometimes, could be family name that carries over, but not

19 likely.  Oftentimes, it's a characteristic associated with a

20 particular person, and/or a mental characteristic.  They're

21 "Psycho," or "Silent," or "Happy," you know.

22 Q.   And do you know what the English translation of the

23 Spanish word "Triste" is?

24 A.   No.

25 Q.   In your --

1          **THE COURT:**  You're just trying to develop information

2    for cross-examination.  I think we should bring this to an end

3    now.  That's not trying to get at his expert qualifications.

4          **MR. NELSON:**  Very well.  One final question, if I

5    may, your Honor.

6          **THE COURT:**  All right.  Your last question.

7          **MR. NELSON:**  Very well.

8    **Q.**   Officer McDonnell, do -- is it possible for different

9    people within the same gang to have the same moniker?

10   **A.**   Yeah, but usually there's a variation.  So, like, with

11   Mr. Lopez, there are two Spookies.

12         **THE COURT:**  Two what?

13         **THE WITNESS:**  Two Spookies.

14         Rommel Naves --

15         (Reporter interruption)

16         **THE WITNESS:**  Rommel, R-o-m-m-e-l, Naves, N-a-v-e-s,

17   is "Little," or L-i-l, "Spooky."

18         So you can have the same moniker, but oftentimes they

19   make a distinction, by giving it the "Little."

20         **MR. NELSON:**  Very well.  That's all I have, Officer.

21         Thank you, your Honor.

22         **THE COURT:**  We're going to take a break in the back,

23   and we're going to proceed to the Government's redirect.

24         **MR. FRENTZEN:**  Your Honor, I have approximately five

25   questions, literally.

1          THE COURT:  Just five questions?

2          MR. FRENTZEN:  Yeah.

3          MR. CANNON:  Excuse me, your Honor.  I have a little

4   bit of examination.

5          THE COURT:  Well, Mr. Cannon, do you have something

6   that is genuine for the purpose of today's hearing that has not

7   been covered by the other counsel?

8          MR. CANNON:  I do, your Honor.

9          THE COURT:  All right.  When we come back I'll let

10  you ask your questions, but I want you to know I think most the

11  last hour has been spent just developing ammo for trial, and

12  not for the purpose of finding out whether this witness has got

13  any foundation for his opinions.  So we're going way beyond the

14  purpose of today's hearing.  If you think you have something

15  that's within today's hearing, I'm going to let you ask the

16  question, Mr. Cannon.

17         MR. CANNON:  Thank you, your Honor.

18         THE COURT:  We'll take a break.

19         Now, who's my chief marshal here?  Who's in charge?

20         All right.  Mr. Franco, whose name has been mentioned

21  prominently today -- make sure that he gets special security.

22  All right?

23         We'll take a 15-minute break at this time.

24         (Whereupon there was a recess in the proceedings

25         from 9:34 a.m. until 9:58 a.m.)

1      **THE COURT:**  All right.  Does it look like we're

2  reside to go right now?  It seems that way to me.  Our

3  interpreter's on line.  All right.

4      Mr. Cannon, your turn.

5      **MR. CANNON:**  Thank you, your Honor.

6      <u>**CROSS EXAMINATION**</u>

7  **BY MR. CANNON**

8  **Q.**  Good morning, Officer McDonnell or Sergeant McDonnell, I

9  should say.  I'm just going to ask you a few questions about

10  the bases of your opinion, based upon your résumé and your

11  experience and training and things like that.

12      In your résumé, you talk about -- you assisted other

13  federal agents -- assisted federal agencies, including the

14  Bureau of Alcohol, Tobacco, and Firearms, the FBI, ICE, and

15  Homeland Security?

16  **A.**  Correct.

17  **Q.**  And you also assisted other jurisdictions, right?

18  **A.**  Correct.

19  **Q.**  And you've mentioned that same "assisting other federal

20  agencies" on multiple occasions in your CV, right?

21  **A.**  Yeah, with regard to -- there are different portions for

22  different time lines, time periods.  Yeah.

23  **Q.**  But it's consistent that you have regular contact with

24  other federal agencies?

25  **A.**  Not regular contact, but there is contact, so it does fall

 1  within the scope of my job duties and my responsibilities.  So

 2  "regular contact" would mean, you know, once or twice a week.

 3  Q.   Okay.  Regular contact once or twice a week.

 4       And there's this active sharing of information between you

 5  and other federal agencies, right?

 6  A.   I'm defining what "regular contact" means to me.  That

 7  would be once or twice a week.  And it was not once or twice a

 8  week.

 9  Q.   Okay.  How often was it?

10  A.   It would depend on -- it would really depend on what

11  you're investigating.  Some investigations, it would be would

12  be once a month.  Some would be maybe once a week.  Some would

13  be maybe once every four months, six months, or some when they

14  need it, as needed.

15  Q.   So there was as-needed sharing of information with federal

16  agents.  Is that fair to say?

17  A.   Not as-needed sharing of information.  As needed,

18  assisting different agencies.  "As needed" was pretty much all

19  encompassing for everybody.  If somebody needed a police

20  report, if somebody needed information, sure, they'd call and

21  get assistance.

22  Q.   You also attended conferences, too.  Is that right?

23  A.   That's correct.

24  Q.   There were federal agencies at these conferences, too.

25  Right?

1   **A.**    Yes.

2   **Q.**    And one of the federal agencies that was represented at

3   these conferences was the FBI, correct?

4   **A.**    Correct.

5   **Q.**    And you know an FBI agent by the name of Carlos Aguirre,

6   right?

7   **A.**    No.

8   **Q.**    Do you know an FBI agent by the name of William Martinez?

9   **A.**    I don't know.  I don't think so.

10  **Q.**    Now, do you -- are you familiar with the FBI investigation

11  related to MS-13 that was going on in Los Angeles?

12  **A.**    No.  I know that there was one.  I read about it in the

13  paper.  Other than that, I wasn't involved in that

14  investigation, no.

15  **Q.**    And in -- and when you were being questioned by

16  Mr. Sabelli, Mr. Sabelli asked you some information;

17  information that you obtained from two informants by the

18  numbers 1211 and 1218, correct?

19  **A.**    Information that I learned through agents; through

20  speaking with them.

21  **Q.**    Yes.

22  **A.**    Correct.

23  **Q.**    And you also had direct contact with those two informants,

24  correct?

25  **A.**    Correct.

1  Q.   And you also had direct contact with other informants,

2  correct?

3  A.   It's possible.

4  Q.   Yes or no?

5  A.   I can't give you an answer, "Yes" or "No."  I don't know

6  who informants you're talking of.  And I talked to everybody in

7  that box (indicating).  So if there are other informants in the

8  box, yes.  So I don't know.

9  Q.   But in addition to the people that are in the box, there

10 are many other people.  You talked about a

11 registration-of-informant process that the San Francisco Police

12 Department goes through, right?

13 A.   That's correct.

14 Q.   And other agencies have a similar process, where

15 informants are registered, right?

16 A.   That is my understanding.

17 Q.   And there's no nobody in this box right now who's

18 registered as an informant with the San Francisco Police

19 Department?

20          MR. FRENTZEN:  Objection.

21          THE COURT:  Sustained.

22 BY MR. CANNON

23 Q.   There's -- in addition to 1211 and 1218, are there other

24 informants who are registered with San Francisco Police

25 Department whom you spoke to that informed some of the bases of

1  your opinions in this case?

2  **A.**    I don't know.

3  **Q.**    Well, you've -- part of your job is to get information

4  from informants, right?

5  **A.**    Correct.

6  **Q.**    You talk informants on a regular basis?

7  **A.**    Whose?

8  **Q.**    You talk to San Francisco Police Department informants?

9  **A.**    I don't know.  The way it works -- if there's a

10  confidential informant, they're confidential.  So if they're

11  somebody's informant, I may not know they're an informant.

12      If they're mine, I know; but it's not going to be hard,

13  because I don't have many, you know; but then if I spoke to

14  them and they're signed up and I may not be aware of it, I

15  don't know.

16      So I am not being evasive.  I don't know if they're an

17  informant.  So I don't know.  I mean, I talk to a lot of

18  people.

19  **Q.**    Right.  You've read a lot of FBI 302s in this case, right?

20  **A.**    No.

21  **Q.**    Well, in connection with learning about MS-13, you've read

22  a lot of FBI reports, haven't you?

23  **A.**    No.

24  **Q.**    You've read your Bureau of Alcohol, Tobacco, and Firearms

25  reports, haven't you?

1  **A.**   No.

2  **Q.**   You've reviewed ICE documents, haven't you?

3  **A.**   Not that I recall.

4  **Q.**   Now, when you say "not that I recall" -- not that you

5  recall right now?  You've dealt with ICE agents on a regular

6  basis, haven't you?

7  **A.**   I did.

8  **Q.**   And those ICE agents had their own informants, didn't

9  they?

10  **A.**   Yes.

11  **Q.**   And those ICE agents gave you information from their

12  informants?

13  **A.**   They shared information.  Correct.

14  **Q.**   And you dealt with FBI agents on a regular basis, right?

15  **A.**   No.

16  **Q.**   You dealt with Homeland Security agents on a regular

17  basis, correct?

18  **A.**   Well, the Homeland Security is kind of a euphemism for the

19  ICE agents.  Correct.

20  **Q.**   Correct, but sometimes they're split into two parts.  They

21  have Customs, and Border Patrol, correct?

22  **A.**   No.  I thought they got swallowed up by ICE.  Aren't they

23  all part of that same umbrella?  They have a terrorism wing.

24  Then they have Immigrations Customs Enforcement, which I guess

25  used to be, formerly, Border Patrol.

1  **Q.**   Correct?

2  **A.**   And during this investigation, I had a lot of contact with

3  them.

4  **Q.**   Okay.  They would pass on information to you that they got

5  from their informants, right?

6  **A.**   Verbally, yes.

7  **Q.**   And that's one of the things that you relied upon in

8  coming to your expert opinions in this case?

9  **A.**   Correct.

10           **MR. CANNON:**  No further questions, your Honor.

11           **THE COURT:**  All right.  The Government may now ask

12  its questions.

13           **MR. FRENTZEN:**  Than you, your Honor.

14                    **REDIRECT EXAMINATION**

15  **BY MR. FRENTZEN**

16  **Q.**   Sergeant McDonnell, you were asked a lot of questions

17  about contacts with the -- with informants; contacts with the

18  defendants in this case.

19       With respect to your opinions, the opinions that you

20  expressed when we were here last, did you base any of those

21  opinions on an interview with one particular individual, be it

22  informant or defendant, without anything else?

23  **A.**   No.

24  **Q.**   When you are told certain information, whether it's

25  directly from an informant, directly from one of these

1    individuals when you had contacts with them -- the defendants,

2    I mean -- or information is related to you that may have come

3    from an informant -- I mean, through somebody else, like an

4    agent -- do you just automatically take that at face value?

5         **MR. THOMSON:**  Objection, your Honor.  Vague as to

6    "these individuals."  They aren't referenced as to who you

7    mean.

8         **MR. FRENTZEN:**  I said "the defendants."

9         **MR. THOMSON:**  The statements was "these individuals."

10        **THE COURT:**  All right.  With that clarification,

11   please answer.

12        **THE WITNESS:**  These people?  These defendants?  No.

13        If I get a source of information from one individual,

14   no.  I need more than that to form an opinion.

15   **BY MR. FRENTZEN**

16   **Q.**   Why is that?

17   **A.**   Because people lie, you know.  So it's incumbent upon us

18   to verify, or at least corroborate information.

19   **Q.**   And similarly, if you would get information from an

20   informant that is not one of these defendants, do you just take

21   that at face value?

22   **A.**   No.

23   **Q.**   In the event that Manuel Franco was ever an informant, was

24   he ever your informant?

25   **A.**   No.

1   **Q.**   Was 1218 ever your informant?

2   **A.**   No.

3   **Q.**   Was 1211 -- I'm sorry if I said -- I think I said "1218"

4   the first time.

5   **A.**   You did.

6   **Q.**   Were either 1211 or 1218 your informant?

7   **A.**   No.

8   **Q.**   You were asked questions about the alpha files.  Did you

9   produce -- did you seek out and produce the GTF's alpha files

10  in this a particular case?

11  **A.**   I did.

12  **Q.**   And who did you produce those to?

13        **MR. SABELLI:**   Your Honor, I'm going to object and

14  move to strike that last answer.  I'm not sure what

15  Mr. Frentzen meant when he said, "Did you seek out and

16  produce."  I'm going to object to that last question and last

17  answer as vague.

18        **THE COURT:**   All right.  Can you clarify "seek out and

19  produce"?

20        **THE WITNESS:**   Well, the way I understand it is the

21  same line of questioning as the Judge had before, about seeking

22  out any prior existing alpha files, and combining that

23  information; that all of the alpha files were found, if there

24  was any in existence.  So I did seek out.  And if there were

25  some, they were produced.

1              **THE COURT:**  Produced to who?

2              **THE WITNESS:**  To the Court.  Anything that was found

3    that was requested for discovery on all of the defendants, it

4    was provided to the Court.

5              **THE COURT:**  Well, let's clear that up.  Were they

6    provided to the Court, or are they -- I don't remember getting

7    any alpha files.  Maybe I did, but were they provided to the

8    Government?

9              **MR. FRENTZEN:**  No, your Honor.  I believe they were

10   produced to the Court and to the defense, as a consequence of

11   subpoena.

12             **THE COURT:**  Oh, all right.

13             **THE WITNESS:**  They -- I --

14             **THE COURT:**  The defense lawyers agree to that?

15             **MR. GOODMAN:**  Yes.

16             **MS. POLLOCK:**  Yes.

17             **THE WITNESS:**  There were two versions.  One was

18   redacted, and one was not redacted.  And there were lots and

19   lots of CDs.

20             **THE COURT:**  All right.

21   **BY MR. FRENTZEN**

22   **Q.**   And again, just briefly, if you could, describe for us

23   what is the purpose of the alpha file.

24   **A.**   The alpha file?  That file, itself, is a tool for the

25   investigator -- gang investigator -- when going to court,

1    through the validation process in court.  There you go.

2    **Q.**    For what purpose?

3    **A.**    For discussing the contacts that an individual had in the

4    context of validating them as a gang member, and why it's

5    relevant, and basing our opinion on that particular contact and

6    that particular association and any of the information that is

7    in a report or in a file, and how it's perfect; but it's also

8    to show all of contacts that they've had with the police,

9    regardless of what the contact is.

10   **Q.**    And you were shown this form -- (indicating) -- from the

11   alpha file with respect to a couple of different defendants.

12   The one I'm holding here is, just by way of example, the alpha

13   file of gang member validation chronological history for

14   Danilo Velasquez.

15        I just wanted to clarify.  I thought you were saying on --

16   during the course of your cross-examination that the alpha

17   file, if you will, or the type of information that goes into

18   the alpha file -- that there was -- some verbiage might be

19   different; that that is consistent with your understanding of

20   what other law-enforcement officers and gang investigators do

21   in the state of California.

22   **A.**    With regard to the criteria, correct, for identifying gang

23   members' validation process, yes.

24              **MR. FRENTZEN:**  One moment, your Honor.

25              No further questions.  Thank you, your Honor.

1         **THE COURT:**  All right.  Is this really necessary?

2         **MR. GOLDROSEN:**  It's two questions.

3         **THE COURT:**  How many?

4         **MR. GOLDROSEN:**  Two.  Maybe three.

5         **THE COURT:**  All right.  I'll let you have two

6  questions.

7         **MR. GOLDROSEN:**  Thank you.

8                    **RECROSS EXAMINATION**

9  BY MR. GOLDROSEN

10 **Q.**   Sergeant McDonnell, I think what Mr. Frentzen was asking

11 you -- and I want to make sure I understand this correctly --

12 is, you were saying that none of your opinions are based solely

13 on information learned from a particular defendant or from a

14 particular informant.  Is that correct?

15 **A.**   Yeah, but what I was trying to explain to Mr. Frentzen is

16 that whatever information I learned from one spot is

17 corroborated with additional information prior to making the

18 opinion; so not just one topic.

19        Even if somebody has self-admitted that they're a

20 gangster, just that alone is strong, but still requires

21 additional.  And that's the kind of vetting process that we use

22 in the office.

23 **Q.**   So these opinions that you have listed here and discussed

24 with us -- those are pretty much based on a number of

25 circumstances; a number of factors.  Is that correct?

1    **A.**    Correct.

2    **Q.**    And would it be correct, though, with respect to each and

3    every one of those opinions, information you've learned, either

4    directly or indirectly, from defendants and from informants, is

5    part of the basis for each and every one of those opinions?

6    **A.**    Yeah.  I mean, it's all part and parcel.  I mean, the

7    reports, the conversations, the personal dealings, training,

8    experience, defense expert testimonies, other experts'

9    testimonies -- I mean, all of it kind of goes into the pot as

10   information that I'm relying on and utilizing.

11   **Q.**    And a critical part would be information from sources and

12   defendants in this case.  Is that correct?

13   **A.**    Well, I don't know if it's a critical part.

14            **THE COURT:**  Well, are they a part?

15            **THE WITNESS:**  I mean, yeah.  I mean, everything's a

16   part.

17            **MR. GOLDROSEN:**  Okay.

18            **THE COURT:**  When you say -- I couldn't tell if you

19   were saying "Yes."  Is that a "Yes"?

20            **THE WITNESS:**  Yeah.  If there was information that

21   was from a confidential source, a source, a 1211, 1218, any of

22   the ones in the box, yes.

23   **BY MR. GOLDROSEN**

24   **Q.**    That's all a part of the bases for your opinions?

25   **A.**    Correct.

```
 1              MR. GOLDROSEN:  Thank you.

 2              THE COURT:  All right.  No one else is standing up.

 3              MR. SABELLI:  I don't have any questions, your Honor.

 4              THE COURT:  Mr. Sabelli.  All right.

 5              Anything further by the Government within the scope

 6  of Mr. Goldrosen's recross?

 7              MR. FRENTZEN:  Absolutely not, your Honor.

 8              THE COURT:  All right.  So the evidentiary hearing of

 9  this witness is at an end, correct?

10              MR. FRENTZEN:  That's correct, your Honor.

11              THE COURT:  All right.  So --

12              MR. SABELLI:  Yes, your Honor, with one reservation.

13  The Court still has to rule on our motion.  It may be that the

14  Court --

15              THE COURT:  With that reservation.  It's possible we

16  would bring the witness back, but otherwise, Sergeant, you may

17  take off.  You're free to go.

18              THE WITNESS:  Thank you, your Honor.

19              THE COURT:  All right.  Leave any documents that we

20  gave you here.

21              THE WITNESS:  Return.

22              THE COURT:  And thank you for coming.

23              Now let me ask the lawyers this question.  Is there a

24  machine working now?  Is this working?

25              THE CLERK:  Yes.  Your mic is on.
```

1          **MS. KEATING:**  I'm getting feedback again through the

2   speaker.

3          **MR. ROSENBUSH:**  Not as loud as before, but it's

4   pretty distracting.

5          **THE COURT:**  All right.  Let's turn that off, then.

6   Did they come and look at it?

7          **THE CLERK:**  They did.  What they want me to do to

8   troubleshoot it will take time, so I wasn't doing it while they

9   were here.  So I'd have to do it off-line.

10          **THE COURT:**  Okay.  Do we have a briefing schedule of

11   this matter for the follow-up to the hearing?  The -- I don't

12   think we do yet, do we?

13          **MR. SABELLI:**  We do not, your Honor.

14          **MR. GOLDROSEN:**  We still have one more day of hearing

15   on Friday for the balance of Sergeant Molina.

16          **THE COURT:**  Well, I'm going to want the briefing

17   pronto.  So we'll set one on Friday, but be thinking that the

18   one brief is going to be due next week.  And then the follow-up

19   brief is due the following week, so that we get it done while I

20   can remember most of this; it isn't dragged out.

21          All right.  Have we now done everything we need to do

22   for today?

23          **MR. FRENTZEN:**  Yes, your Honor.

24          **MR. GOLDROSEN:**  I believe so.  Yes.

25          **MR. THOMSON:**  Yes, your Honor.

```
 1              THE COURT:  All right.  So again, I say to the
 2   marshals to give Mr. Franco extra attention.
 3              And today's hearing is now at an end.  And I'll see
 4   you again on tomorrow, right?  Don't I have a hearing tomorrow?
 5              MR. LEUNG:  Yes, your Honor, on a suppression motion
 6   filed by Mr. Vermeulen on behalf of Giovanni Hernandez.
 7              THE COURT:  Is that just limited appearances, or does
 8   the entire group come?
 9              MR. LEUNG:  I believe it's limited appearances.
10              THE COURT:  All right.  And everyone else will
11   reappear on Friday.
12              MR. LEUNG:  Miraculously, your Honor.
13              THE COURT:  All right.  We'll see you all then.
14   Thank you.
15              (At 10:15 a.m. the proceedings were adjourned)
16
17
18
19
20
21
22
23
24
25
```

1                        **I   N   D   E   X**

2

**PLAINTIFF'S WITNESSES**                          **PAGE**    **VOL.**

3

**MCDONNELL, DION**

4   (PREVIOUSLY SWORN)                                614        4
    Cross Examination by Mr. Sabelli                 614        4

5   Cross Examination by Mr. Goodman                 658        4
    Cross Examination by Mr. Vermeulen               671        4

6   Cross Examination by Mr. Nelson                  689        4
    Cross Examination by Mr. Cannon                  700        4

7   Redirect Examination by Mr. Frentzen            706        4
    Recross Examination Resumed by Mr. Goldrosen     711        4

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

## CERTIFICATE OF REPORTER

I, LYDIA ZINN, Official Reporter for the United States Court, Northern District of California, hereby certify that the foregoing proceedings in CR. 08-0730 WHA, *United States of America v. Ivan Cerna, et al.*, were reported by me, a certified shorthand reporter, and were thereafter transcribed under my direction into typewriting; that the foregoing is a full, complete and true record of said proceedings as bound by me at the time of filing.

The validity of the reporter's certification of said transcript may be void upon disassembly and/or removal from the court file.

_____

/s/ Lydia Zinn, CSR 9223, RPR

Thursday, November 4, 2010